[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 30, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-14141

_____

D. C. Docket No. 96-02600-CV-WMH

MICHAEL E.A. FORD,

Plaintiff-Appellee,

versus

ROBERT WINSTON BROWN,
EXXON CORPORATION,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 30, 2003)**

Before TJOFLAT, COX and BRIGHT*, Circuit Judges.

_____
*Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by
designation.

TJOFLAT, Circuit Judge:

The Castle Peak "B" Power Station,[1] located in Hong Kong, exploded on August 28, 1992, killing two people and injuring nineteen others. The event spawned the following proceedings: (1) a Coroner's Inquest in Hong Kong; (2) a Hong Kong Bar Association disciplinary proceeding against Michael Ford ("Plaintiff"); (3) a Hong Kong civil suit against Ford; (4) a law suit in Texas instigated by Plaintiff against Exxon Corp. and Robert Brown ("Defendants"); and (5) this litigation – a law suit filed in the United States District Court for the Southern District of Florida by Plaintiff against Defendants.

After Plaintiff brought this action, Defendants moved to dismiss it on doctrines of comity and forum non conveniens, and for failure to state a claim for relief. The district court denied their motion, and certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We granted Defendants application for permission to take the appeal, and now reverse, concluding that the district court abused its discretion in failing to dismiss the case pursuant to the

---

[1] The Castle Peak Power Station was owned by Castel Peak Power Co., Ltd. ("CAPCO"), a Hong Kong limited liability company with its principal place of business in Hong Kong. The station was operated by China Light & Power ("CLP"), another Hong Kong limited liability company with its principal place of business in Hong Kong. CAPCO was owned forty percent by CLP and sixty percent by Exxon Energy Ltd. ("EEL"), yet another Hong Kong limited liability company with its principal place of business in Hong Kong. EEL is a wholly owned subsidiary of Esso Eastern, Inc., which is, in turn, a wholly owned subsidiary of the Texas-based Exxon Corp.

forum non conveniens doctrine.[2]  Because this conclusion disposes of the case, we

decline to reach the other issues pressed by Defendants.[3]

I.

Soon after the power station exploded, an Inquest into the cause of the

accident was convened by the Hong Kong Coroner.[4]  CLP and CAPCO retained

the London firm of Holman, Fenwick & Willan ("HFW").[5]  One of HFW's

solicitors, Guy Hardaker, retained Plaintiff as the barrister for the Castle Peak

Inquest.[6]  In the course of his work on the Castle Peak Inquest, Plaintiff became

acquainted with Defendant Robert Brown, who worked as an in-house legal

---

[2]  Plaintiff contends that we lack jurisdiction to entertain this appeal.  Plaintiff has apparently overlooked the case of Van Cauwenberghe v. Biard, 486 U.S. 517, 108 S. Ct. 1945, 100 L. Ed. 2d 517 (1988), which held that interlocutory review of the denial of a motion to dismiss based upon the forum non conveniens doctrine is available pursuant to 28 U.S.C. § 1292(b), and that "[a] court of appeals may then, in its discretion, determine whether the order warrants prompt review."  Id. at 530, 108 S. Ct. at 1953.  Because the district court certified its nonfinal order for interlocutory review pursuant to 28 U.S.C. § 1292(b), and we thereafter granted Defendants' application for permission to appeal, Plaintiff's argument is frivolous.

[3]Defendants contend that the district court erred when it failed to dismiss the case for reasons of comity and because Plaintiff bases his claims, at least in part, on his improper disclosures of client confidences.  Although we do not reach either of these issues independently, both are ultimately intertwined with the forum non conveniens calculus discussed infra.

[4]The recitation of the facts in this part is based upon Plaintiff's complaint, unrebutted affidavits, and two Hong Kong judicial opinions.

[5]HFW has an office in Hong Kong.

[6]The plaintiff was (and continues to be) a British citizen who worked as a barrister in Hong Kong.

3

counsel to EEL in Hong Kong.[7] (Plaintiff alleges that although Brown purported to serve at the behest of EEL, Brown was in fact an agent of Defendant Exxon Corp.)

While Plaintiff was preparing for the Inquest, he became suspicious that Exxon Corp. and Brown (both in the United States), in conjunction with other parties working on behalf of CLP and CAPCO, were orchestrating a cover-up designed to hide the cause of the explosion from the Coroner. The motive for this deception, Plaintiff contends, was to prevent charges of gross negligence and manslaughter against those responsible for the accident. Plaintiff claims, for example, that CLP created a so-called "Red Report," a false report which listed the cause of the explosion as "water entrapment," whereas, in reality, the cause of the explosion was "the jamming of the inner cup of the gas holder, which had not been inspected internally since its installation in 1995."[8] At this point, Plaintiff claims that he contacted the Hong Kong Bar Association for guidance about how to proceed with his representation in the face of an ethical dilemma, and that the Bar

---

[7]Brown currently lives and works in Florida.

[8]The real story was, according to Plaintiff, reflected by CLP's original "Blue Report." Plaintiff alleges that the "Blue Report" was substituted with the "Red Report" during the Coroner's Inquest.

4

Association instructed him to withdraw from the case.[9]  Before he could withdraw from his representation of CLP and CAPCO, Plaintiff asserts that he was fired by Hardaker (at the direction of Exxon and Brown) in a public fashion, thereby embarrassing him and causing tremendous financial harm and emotional grief. Plaintiff contends that this conduct, combined with a series of public statements to the Hong Kong press and Hong Kong legal community,[10] constitutes several actionable torts (discussed infra).

Defendants have a different story.  First, they contend that they had nothing to do with the events that transpired in Hong Kong.  They had no influence over the hiring or firing of Plaintiff, nor were they part of the legal team comprised of CLP and CAPCO lawyers.  Second, they argue that Plaintiff's "cover-up" theory is a lie.  Rather, Plaintiff was not sufficiently prepared to represent CLP and CAPCO at the Inquest, and he invented the cover-up story in order to cease his representation without harm to his reputation.  Defendants also point to another

---

[9]Plaintiff now denies that he ever told CLP and CAPCO that the Hong Kong Bar Association instructed him to withdraw from the Coroner's Inquest.  As we discuss infra, the Hong Kong Bar Association disagreed; it ultimately sanctioned Plaintiff for falsely telling his clients that the Bar Association compelled Plaintiff to withdraw from his representation of CLP and CAPCO.

[10]At first blush, the complaint appears to allege that Exxon Corp. and Brown fired Plaintiff and made the allegedly false statements themselves, with no intermediary.  Upon closer scrutiny, however, it becomes clear that agents of CLP and CAPCO committed the allegedly tortious acts.  Plaintiff claims, in short, that these agents were, in fact, working at the behest of (and in conspiracy with) Exxon Corp. and Brown.

reason for firing Plaintiff: he allegedly lied about being instructed by the Hong Kong Bar Association to cease his participation in the Inquest. Defendants point to various affidavits from officials with the Hong Kong Bar Association that the Association never instructed Plaintiff to withdraw from his representation of CLP and CAPCO.

After he was fired, Plaintiff retained several documents relating to his representation of CLP and CAPCO. Plaintiff refused to hand over the documents, and CLP and CAPCO filed suit, alleging conversion and breach of Plaintiff's duty of attorney-client confidentiality. CLP and CAPCO obtained a preliminary injunction from the Supreme Court of Hong Kong.[11] This injunction enjoined Plaintiff from releasing to third parties any of the documents or information that Plaintiff obtained in the course of his representation of CLP and CAPCO in the Castle Peak Inquest. The litigation continued in Hong Kong (while the Texas case, discussed infra, was pending), and the Supreme Court of Hong Kong eventually awarded damages to CLP and CAPCO and made the injunction permanent.[12] In response to Plaintiff's cover-up theory, the court found that no such conspiracy

---

[11]The Supreme Court is the trial court in Hong Kong.

[12]Commenting on Plaintiff's decision to instigate proceedings in the United States, the court stated that it was "perfectly satisfied that those proceedings were commenced utilising either original, or copy documents, obtained from [CLP and CAPCO]" and that "[i]t would appear, therefore, 'prima facie', that Mr. Ford is in contempt of this Court."

existed and that Plaintiff's actions were "disgraceful." On appeal, the Hong Kong Court of Appeal similarly noted that Plaintiff's retention of the documents was not "legally justified," and that the allegations of a conspiracy were "unfounded in terms of any real evidence."

While under the preliminary injunction,[13] Plaintiff filed suit in Texas state court using the documents and information retained from his representation of CLP and CAPCO during the Coroner's Inquest. Plaintiff eventually dismissed his case in Texas and refiled it in Florida.[14] In 1994 – after Plaintiff filed suit in Texas but prior to the Florida litigation – the Supreme Court of Hong Kong entered the final judgment against Plaintiff (discussed supra). In a similar vein, the Hong Kong Bar Association instituted disciplinary proceedings against Plaintiff. The Bar Association ultimately suspended Plaintiff from practicing law as a barrister in Hong Kong for four years.[15]

---

[13]Plaintiff contends that he and his attorney were unaware of the injunction when they filed suit in Texas four days after the injunction was issued.

[14]Plaintiff first filed suit in Circuit Court for Miami-Dade County, and Defendants removed to federal court. The district court remanded the case; it was refiled in the district court on September 12, 1996 pursuant to the court's diversity jurisdiction.

[15]Plaintiff was suspended for two years due to his misuse of confidential client information relating to his representation of CLP and CAPCO in the Inquest. He was suspended an additional two years for misrepresenting to his client that the Hong Kong Bar Association had instructed him to withdraw from his representation of CLP and CAPCO during the Coroner's Inquest.

As a result of his public termination from the Castle Peak investigation and a host of public statements, Plaintiff claims that his reputation as a barrister in Hong Kong was destroyed. He brought suit pursuant to the district court's diversity jurisdiction, 28 U.S.C. § 1332, asserting the following torts: intentional interference with business relations, intentional infliction of emotional distress, and defamation.[16] Defendants moved to dismiss, arguing that the doctrine of forum non conveniens dictates that the case be heard in Hong Kong or England rather than Florida. Plaintiff, on the other hand, argued that Defendants should be sanctioned for allegedly deceiving the district court.[17] The district court denied both motions, declining to sanction Defendants while simultaneously refusing to dismiss the case.

## II.

## A.

The doctrine of forum non conveniens "authorizes a trial court to decline to exercise its jurisdiction, even though the court has venue, where it appears that the convenience of the parties and the court, and the interests of justice indicate that

---

[16]The causes of action appear, respectively, in counts one, two, and three of Plaintiff's complaint. Plaintiff also requested a jury trial, which would have been unavailable in Hong Kong or England.

[17]Plaintiff contended that the conduct on which the lawsuit focused – an alleged cover-up conspiracy regarding the cause of the Castle Peak explosion – constituted a fraud on the court.

the action should be tried in another forum." Sibaja v. Dow Chem. Co., 757 F.2d

1215, 1218 (11th Cir. 1985).  Justice Jackson's articulation of the doctrine

describes the balancing test as follows:

> An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant.  Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.  There may also be questions as to the enforcibility of a judgment if one is obtained.  The court will weigh relative advantages and obstacles to fair trial.  It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.  But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.
> Factors of public interest also have a place in applying the doctrine.  Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin.  Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.  In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.  There is a local interest in having localized controversies decided at home.  There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S. Ct. 839, 843, 91 L. Ed.

1055 (1947).

This court has provided additional glosses on the forum non conveniens doctrine that are especially relevant to this case. For example, we recently concluded that "the bias towards the plaintiff's choice of forum is much less pronounced when the plaintiff is not an American resident or citizen." Esfeld v. Costa Crociere, S.P.A., 289 F.3d 1300, 1312 n.15 (11th Cir. 2002). In the same case, we maintained that "foreign relations are implicated in the forum non conveniens calculus." Id. at 1313. Thus, "federal courts necessarily must analyze the interest that the foreign country has in the dispute, an analysis that may raise issues of international comity." Id. We also recently emphasized the importance of the choice-of-law factor, concluding that it is "[f]ar better that the case be tried in [a foreign country] by one or more jurists as familiar with [foreign] law as we are unfamiliar with it." Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424, 1430 (11th Cir. 2002). Finally, we described the procedure district courts must typically follow when they dismiss a case on forum non conveniens grounds: "In order to avoid unnecessary prejudice to [plaintiffs]," the district court can attach conditions to a dismissal with which the defendants must agree. Id. at 1430. In Magnin, for example, we observed that "the defendants agreed to submit to the jurisdiction of the French court, waive any statute of limitations or jurisdictional defenses, and satisfy any final judgment." Id.

B.

We review the district court's denial of Defendants' motion to dismiss for abuse of discretion. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419 (1981). "[T]he court abuses its discretion when it fails to balance the relevant factors." C.A. La Seguridad v. Traysytur Line, 707 F.2d 1304, 1308 (11th Cir. 1983). We conclude that the district court overlooked some highly relevant factors, and that it ultimately struck a balance that was an abuse of discretion.

Perhaps the most important "private interest" of the litigants is access to evidence. Applying the factors suggested by Justice Jackson in Gilbert – access to proof, availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining witnesses – it becomes apparent that the balance weighs strongly against adjudicating this dispute in Florida. A correct "private interest" analysis begins with the elements of the plaintiff's causes of action. The court must then consider the necessary evidence required to prove and disprove each element. Lastly, the court should make a reasoned assessment as to the likely location of such proof. See Van Cauwenberghe v. Biard, 486 U.S. 517, 528, 108 S. Ct. 1945, 1953, 100 L. Ed. 2d 517 (1988) ("To examine 'the relative ease of access to sources of proof,' and the availability of witnesses, the district court must scrutinize the

11

substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant, to the plaintiff's causes of action and to any potential defenses to the action.") (citation omitted).

In this case, all of the alleged acts occurred in Hong Kong. Moreover, the acts occurred in the course of Plaintiff's representation of Hong Kong clients in an Inquest on the subject of an explosion that occurred in Hong Kong.[18] Based upon these facts alone, it is apparent that much of the evidence is likely to be in Hong Kong (unless, of course, documents and witnesses have moved[19]). A trial on defamation and interference with business relations will necessarily focus on Plaintiff's reputation in the Hong Kong community – both before and after the alleged acts – as well as other factors that might have sparked a decline in his

---

[18]The facts surrounding the Castle Peak explosion are an integral part of Plaintiff's complaint, which places the allegedly defamatory statements in the context of a broad scheme to deceive tribunals throughout the world regarding the true cause of the plant explosion. The details of the explosion and subsequent Inquest must therefore be established with evidence. The documents relating to the maintenance of the Power Station and explosion are located in Hong Kong. Documents relating to the subsequent investigation and Plaintiff's termination are also located in Hong Kong – specifically, in the files of CLP and CAPCO, the Hong Kong Coroner's files, and the files of CLP/CAPCO lawyers.

[19]Several key witnesses who formerly lived in Hong Kong have moved to England over the last few years. None of them, however, have moved to the United States (much less Florida). We note that the district court did not make a factual determination that documentary evidence is unavailable in Hong Kong. Rather, it merely speculated that some of the evidence might have disappeared, concluding that "neither the parties nor the Court have any guarantee that documents that were once in Hong Kong still remain there."

business (e.g., the impact of Hong Kong's reversion to China in 1997).  The damages stage of the trial will similarly focus on the effect of the firing upon Plaintiff's law practice – a practice that revolved around a Hong Kong client base. The circumstances surrounding the false statements that Defendants allegedly made to the Hong Kong press must also be established with evidence that can be found only in Hong Kong.  In short, this litigation entails a Hong Kong-centered dispute, and most of the evidence therefore exists in Hong Kong.[20]

Plaintiff, like the district court, pointed to the alleged "conspiracy theory" and the fact that Defendants reside in the United States, not Hong Kong.  But these points are relevant only to the "who" question – i.e., who, precisely, committed the alleged acts of defamation, intentional infliction of emotional distress, and interference with business relations?  Were these acts committed only by the direct purveyors of the allegedly defamatory statements (i.e., agents of CLP and CAPCO)?  Or were the statements made at the behest of powerful executives at Exxon Corp.?  Thus, the only way the United States is implicated in this litigation at all is that Defendants might have worked "behind the scenes" to achieve the goal of the alleged conspiracy (namely, a cover-up of the true cause of the explosion),

---

[20]One of Defendants' affidavits lists ninety-five potential witnesses, nearly all of whom reside outside of the United States.

13

including the silencing of potential whistleblowers by destroying their careers.[21]

While the "who" question is no doubt important, it is only one of the many facts that must be proved in this case. Moreover, to the extent that the corporate connectedness between Exxon Corp. and Castle Peak is relevant, the evidence of this connectedness exists primarily in Texas, not Florida. Of the sixteen Exxon employees appearing on Plaintiff's proffered witness list, one has died and eleven live in Texas, not Florida. Indeed, all of the witnesses, with the exception of defendant Brown, live outside of Florida. In short, most of the evidence in this litigation is in Hong Kong, while some witnesses are in England and others are in Texas. Florida is relevant only because one alleged Exxon employee, defendant Brown, happened to live in Florida at the time Plaintiff took a notion to sue. Of all possible forums, Florida is unquestionably the worst.

On the "public interest" side of the equation, the district court overlooked important comity concerns that are implicated by its decision to entertain this suit.[22]

---

[21]Unlike criminal law, a conspiracy in the civil law context is not actionable; rather, a conspiracy is simply a means of creating vicarious liability. That is, a tort must actually be committed by someone in the conspiracy. If Defendants are liable, it is because the principal defamers made the defamatory comments pursuant to an agreement with Defendants. Thus, Plaintiff must first prove that acts of defamation actually took place. And that is why the vast majority of evidence is in Hong Kong. Hong Kong is also the place where the fallout from the allegedly defamatory acts – highly relevant in a defamation case – must be assessed.

[22]Because our forum non conveniens analysis removes the necessity of having to reach other issues in this case, we do not address Defendants' argument that comity considerations independently require dismissal. Rather, we feel it appropriate to include comity as a factor in

14

See Esfeld, 289 F.3d at 1312. Plaintiff essentially wants the district court to contradict the conclusion of the Hong Kong courts and the Hong Kong Bar Association that there was no conspiracy. He also asks the district court to enable him to use confidential client information – a tactic that would not be available in Hong Kong in light of the permanent injunction. The district court is, in short, being asked to overlook the respect that a foreign sovereign is due. See Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S.D. Iowa, 482 U.S. 522, 534 n.27, 107 S. Ct. 2542, 2556 n.27, 96 L. Ed. 2d 461 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."); Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994) (emphasizing the importance of a "proper level of respect for the acts of our fellow sovereign nations . . . ."). As a corollary, Hong Kong has a strong interest in adjudicating this dispute, which implicates the conduct of a member of the Hong Kong Bar and an event that took place in Hong Kong. Finally, we note that Hong Kong law provides the rule of decision in this case,[23] which Magnin holds is a very

_____

the forum non conveniens calculus.

[23]The district court held that Hong Kong law provides the rule of decision, and all of the parties agree that this holding was correct.

15

important factor.[24]

The public and private interest factors point to only one conclusion: this case should not be litigated in Florida. The district court's analysis was flawed in three respects. First, the court did not consider the elements of the causes of action (e.g., the harm to reputation that must be proved in a defamation claim) and the likely sources of proof. Instead, it focused solely upon one issue – whether Defendants in fact played a role in the allegedly tortious acts.

Second, the district court concluded that Hong Kong is an unavailable forum,[25] even though Defendants waived defenses based upon jurisdiction and the statute of limitations. In Magnin, 91 F.3d at 1430-31 (11th Cir. 1996), we approved of conditional dismissals, in which the district court dismisses the case only if the defendant waives jurisdiction and limitations defenses, and only if it turns out that another court ultimately exercises jurisdiction over the case. We never indicated that a defendant must have an affidavit from a lawyer in the foreign jurisdiction

[24]The district court focused on the fact that Hong Kong tort law somewhat overlaps with American tort law. We think, however, that tort law (like all areas of the law) is rife with nuances that are not consistently found throughout all jurisdictions. Therefore, the foreign country is ordinarily the best place to litigate a dispute revolving around a foreign rule of decision.

[25]The district court must engage in a two-part inquiry, considering first the availability and adequacy of the alternative fora before engaging in the public interest/private interest balancing test. See C.A. La Seguridad v. Transytur Line, 707 F.2d 1304, 1307 (11th Cir. 1983) ("As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case.").

predicting that the foreign tribunal will ultimately assert jurisdiction over the case and recognize any limitations waiver.[26] Since the district court's dismissal is conditional, it may reassert jurisdiction in the event that the foreign court refuses to entertain the suit. There would be little point in approving of this device while simultaneously requiring proof that the foreign jurisdiction will reach the merits of the case. In a similar vein, the Second Circuit agreed that affidavits attempting to predict what a foreign jurisdiction will do have little value. See Schertenleib v. Traum, 589 F.2d 1156, 1163 (2d Cir. 1978). Although the district court in that case did receive expert testimony that Geneva would accept jurisdiction, the Second Circuit assessed the evidence as follows: "If, moreover, contrary to the expert testimony relied on by [the district judge] in this case, Geneva refuses jurisdiction notwithstanding defendant's consent, plaintiff is still protected by the conditional nature of the dismissal. Thus, further inquiry into the foreign jurisdictional law

---

[26]The cases cited by the Plaintiff do not support such a proposition. In Mercerier v. Sheraton Int'l, Inc., 935 F.2d 419, 426 (1st Cir. 1991), the court appeared to place the burden of proof on the plaintiff: "[E]ven given a willingness on [the defendant's] part to abandon [a statue of limitations defense], the [plaintiff] must be given an opportunity to question whether Turkish courts would accept such a waiver – and, if they would not, to argue the effect of such a refusal to the court deciding the forum non conveniens motion." Id. Similarly, our decision in Republic of Panama v. BCCI Holdings (Lux.) S.A., 119 F.3d 935 (11th Cir. 1997), appears to require the plaintiff to rebut the defendant's assertion that a foreign jurisdiction will reach the merits of the case. See id. at 951 ("Because Panama has never contested the BCCI defendants' assertion that they are amenable to process in the liquidation proceedings, we may reverse the district court's initial determination only if we conclude that these liquidation proceedings are clearly unsatisfactory."). At the very least, neither case requires the defendant to produce an affidavit like the one Plaintiff contends is necessary.

really is needless since it is so easily obviated by the use of the typical conditional dismissal device." Id. We conclude that the district court erred when it held that Hong Kong was an unavailable forum solely because Defendants did not present evidence that the Hong Kong courts would ultimately accept waivers of any jurisdiction and limitations defenses.

Third, the district court erred in its assessment of the location of the relevant evidence. Not only did it fail to use Plaintiff's causes of action as a guidepost, it also looked to facts that are of no consequence. Consider, for example, the district court's conclusion that Defendants "undermined their original argument that positively everything having to do with the instance case occurred in, and can be found in, Hong Kong" when they argued that five of the key witnesses (including Plaintiff) live in England. The fact that prominent witnesses are located in England only underscores the point that *Florida* is an inappropriate forum. Indeed, Defendants were willing to submit to the jurisdiction of England, too. It is perfectly reasonable to argue that although Hong Kong is the best forum, England is the second best forum. Taken together, these two propositions establish that there is little to be said for Florida. Yet the district court somehow believed that the fact that some witnesses live in England dilutes the attractiveness of Hong Kong such that *neither* forum is superior to Florida. We find this conclusion puzzling.

18

We also find it troubling that the district court gave so much weight to Defendants' ability to produce evidence at the joint hearing on sanctions and the forum non conveniens motions. Under this theory, if the Defendants produce evidence, they risk losing their forum non conveniens battle because they have shown that it is not too difficult to gather the needed evidence; if they do not produce evidence, they will lose because they have the burden of proof of establishing that the forum non conveniens balancing test weighs in favor of dismissal. The law does not put to defendants this Hobson's choice.

### III.

For the foregoing reasons, the district court's order is REVERSED and the case is REMANDED with the instruction that the district court conditionally dismiss the case.

SO ORDERED.

BRIGHT, Circuit Judge, concurring:

I agree with the majority that the district court erred in concluding that Hong Kong was an unavailable forum. The district court should have conditionally dismissed Ford's claims in favor of jurisdiction in Hong Kong.

As the majority explains above,[1] the district court misread the decision in Magnin v. Teledyne Cont'l Motors, 91 F.3d 1424 (11th Cir. 1996). *Supra* at 16-17. Instead, the district court concluded that Hong Kong was not an available forum because the defendants failed to "provide any evidence to support the assertion that Hong Kong is an available forum." Dist. Ct. Op. at 16. Had the district court properly applied the law in Magnin, it might have concluded that Hong Kong was an available forum.

I add some additional comments about the litigation. In examining the public interest factors, I do not believe the district court's choice of Florida over England would have been irrational or improper. The district court stated in reference to

---

[1]The majority comments:

> We never indicated that a defendant must have an affidavit from a lawyer in the foreign jurisdiction predicting that the foreign tribunal will ultimately assert jurisdiction over the case and recognize any limitations waiver. Since the district court's dismissal is conditional, it may reassert jurisdiction in the event that the foreign court refuses to entertain the suit. There would be little point in approving of this device while simultaneously requiring proof that the foreign jurisdiction will reach the merits of the case.

*Supra* at 16-17 (footnote omitted).

retaining jurisdiction in the United States District Court for the Southern District of

Florida:

> When "extensive pretrial discovery and proceedings have already taken place over a period of" years in the current forum, that current forum would not be significantly more overburdened and inconvenienced were it to continue exercising jurisdiction over the case. Schexnider, 817 F.2d at 1163. This factor most definitely weighs in favor of Plaintiffs, as this Court has presided over nearly a dozen days of evidentiary hearing on just the forum non conveniens and motions for sanctions issues. The sheer volume of evidence and the parties' filings relating to these issues alone is larger than that of most of the cases currently pending before this Court. Moreover, not only has this Court engaged in serious deliberation regarding the instant case, but also Magistrate Judge Dubé has worked diligently on several case management and discovery issues. Clearly, this factor weighs in favor of the Court retaining jurisdiction over the instant case.

Dist. Ct. Op. at 27-28. The district court spent a significant amount of time and

energy in weighing whether it should retain jurisdiction over Ford's case.

Finally, I disagree with the majority's statement that "[o]f all possible forums,

Florida is unquestionably the worst." *Supra* at 14. In regard to whether Florida had

an interest in retaining jurisdiction over the case, the district court commented:

> Depending on how one conceives of the instant case, the controversy may invoke the "local interests" of Hong Kong and/or the United States. The basis of Plaintiff's Complaint involves events that occurred, in substantial part, or at least took effect in Hong Kong. However, Plaintiff's theory of his case is that employees of Defendant Exxon engaged in decisions in Texas that impacted Plaintiff in Hong Kong. In this way, the controversies directly at issue here involve an American defendant taking action in the United States. These decisions, due to the ease with which business is increasingly

21

conducted globally, came to fruition in Hong Kong. In short, an
American jury has an interest in deciding controversies involving
domestic Defendants who acted both at home and abroad.

Dist. Ct. Op. at 28. The district court gave the issues in this case careful

consideration during an eleven-day hearing.

The trial court erred in construing the applicable law. Thus, its assessment of

the facts, based on its erroneous view of the law, also became flawed. I would

agree that Hong Kong is the preferred forum under the applied law as construed by

this court. Thus, I concur in the result.