[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15388

_____

D. C. Docket No. 04-20727-CV-JEM

LIQUIDATION COMMISSION OF BANCO INTERCONTINENTAL, S.A.,

Plaintiff-Counter-Defendant- Appellee,

versus

LUIS ALVAREZ RENTA,
WADEVILLE INVESTMENTS, LTD.,

Defendants-Counter-Claimants-Appellants,

BANKINVEST S.A., et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 19, 2008)**

Before DUBINA and KRAVITCH, Circuit Judges, and COOGLER,[*] District Judge.

KRAVITCH, Circuit Judge:

This civil RICO and fraudulent transfer case is a result of the 2003 collapse of Banco Intercontinental SA (BanInter), which at that time was among the largest banks in the Dominican Republic. After its collapse, the affairs of BanInter were taken over by the Commission,[1] a receivership established by the Dominican government. The Commission brought this suit against Luis Alvarez Renta, a Florida businessman, claiming that Renta, with the help of BanInter insiders, wrongfully diverted millions in BanInter funds to finance other business ventures and personal expenses.

Three RICO claims and one fraudulent transfer claim were tried to a jury, which returned a verdict for the Commission in all respects. After trebling of the racketeering damages, the judgment totals approximately $177 million. Renta now appeals, arguing that the entire case should have been dismissed for forum non conveniens, that the RICO claims should have been dismissed for unripeness and because the statute cannot apply extraterritorially, that he is entitled to judgment as

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] The Commission, the appellee here, is formally known as La Comision de Liquidacion Administrativa del Banco Intercontinental.

2

a matter of law or to remittitur, and that the district court erred in denying post-judgment relief. Our review uncovers no reversible error.

**I.**

The evidence at trial, taken in the light most favorable to the verdict, <u>see</u> <u>United States v. Ward</u>, 486 F.3d 1212, 1215 (11th Cir. 2007), showed the following.

*A. The Parties*

Defendant-appellant Renta is a dual citizen of the United States and the Dominican Republic. In addition to undergraduate and graduate training in economics and finance, Renta had years of business experience as an accountant, management and financial consultant, and as manager or director of various family corporations and trusts. At the time of the events in question, he worked as a turnaround specialist; in particular, he helped rehabilitate distressed debt. Renta and his family also owned several companies and trusts, including separate operating, financing, and holding companies. One of those companies was Bankinvest, a defendant below[2] but not a party to the appeal. Bankinvest is a Dominican corporation of which Renta was president and which his family controlled. Renta stated he used Bankinvest as a vehicle for raising capital to make

---

[2] Default judgments were entered against defendants Bankinvest and Interduty. They do not appeal.

commercial loans, the interest and fees from which were paid to Bankinvest, but the Commission presented evidence that Bankinvest was used primarily as a conduit to move money from BanInter to other entities. Bankinvest had checking accounts at BanInter and at The International Bank of Miami (TIBOM) over which Renta had signatory authority at all pertinent times, even after, as explained more fully below, he sold Bankinvest in August 2001.

Ramon Baez-Figueroa was not a defendant in this case, but played a major part in the story. Baez-Figueroa, a prominent Dominican and Renta's relative by marriage, was the President and majority owner of BanInter, and had effective control over its operations. Like Renta, he had a hand in several other business ventures, including a series of duty free stores that eventually became Interduty Free, Ltd., a British Virgin Islands corporation and a defendant below. Baez-Figueroa and Renta entered into an agreement whereby Renta would attempt to rehabilitate the struggling duty free stores, in part by using Bankinvest's good credit. Later, once the stores were on their way to rehabilitation, Renta sold Bankinvest (which by then had an equity stake in the duty free stores) to Baez-Figueroa in August 2001.

Renta is also the sole director and a minority shareholder of appellant Wadeville Investments, a corporation owned and controlled by the Renta family.

4

Wadeville is not an operating company. Its sole purpose is to have a bank account at BankAtlantic, from which Renta pays personal and business expenses.

*B. The Bank Transfers*

The centerpiece of this case is a series of bank transactions, occurring between January 2000 and February 2003, which proceeded in similar patterns. The parties do not dispute that these transactions occurred nor that Renta ordered them, but they sharply dispute their nature and significance. The Commission argued, and the jury believed, that the funds transfers were simply looting of BanInter. Renta argued that the funds transfers were returns of his capital investments in, or payments on loans that he made to, the duty-free stores.

In each transaction, Renta would take some step to cause BanInter funds, typically held in BanInter's dollar-denominated accounts at American banks, to be transferred to an account of Bankinvest (at TIBOM) or Interduty (at BankAtlantic or Hamilton Bank). Although they all had the same effect, namely transferring money from BanInter to a Renta-controlled entity, the transactions took several different forms. Sometimes Renta signed a letter to BanInter requesting a simple transfer of BanInter's funds to Bankinvest. Typically, the letter request would state that the requested funds were needed to pay on a letter of credit for which Bankinvest was a guarantor. On other occasions, Renta would direct BanInter to

5

debit Bankinvest's account at BanInter in a particular amount, and then direct

BanInter to transfer those funds to some other entity. But because Bankinvest's

account at BanInter was perpetually overdrawn, each of the initial debits was, in

substance, a loan or transfer of funds from BanInter to Bankinvest.[3] On other

occasions, BanInter would, at Renta's request, issue a standby letter of credit for

Bankinvest in favor of another Bankinvest creditor, such as TIBOM. In those

cases, BanInter ultimately paid on each letter of credit.

Although most of the transfers were initially made from BanInter to

Interduty or to Bankinvest, the transferred funds did not remain there long. Rather,

the evidence showed that on most occasions, money transferred from BanInter to

Bankinvest was subsequently transferred elsewhere. Sometimes the second

transferee was Interduty, but frequently the funds found their way into the hands of

entities controlled by Renta[4] or Baez-Figueroa.[5] Typically, the second transfer was

for the exact same amount as the request for funds from BanInter. These

---

[3] Renta claimed he did not know whether Bankinvest's account was overdrawn or had sufficient funds to cover these transactions, because he never reviewed Bankinvest's account statements.

[4] To pick one example, the evidence showed that Renta caused BanInter to make a $750,000 transfer from its account to Interduty's account at BankAtlantic on or about May 31, 2002. Three days later, $750,000 was transferred from Interduty's BankAtlantic account to Wadeville.

[5] For example, in April 2001 Renta directed BanInter to debit Bankinvest's account in the amount of $1.25 million and use the funds to set up a certificate of deposit at Hamilton Bank in favor of Groupwide Florida, a company controlled by Baez-Figueroa.

subsequent transfers were often carried out the same day, or within a few days, of the request for funds from BanInter. On some occasions funds were transferred to Interduty, and ultimately used to pay its debts, even when Renta (or his subordinates acting at his direction) represented to BanInter that the requested funds were to be used to pay on a different letter of credit for which BankInvest was a guarantor.

Altogether, Renta endorsed forty six such transactions which resulted in the transfer of $48,455,625 in BanInter funds to the bank accounts of Interduty, entities controlled by Renta or Baez-Figueroa, or, in a few cases, their personal creditors. Of that $48 million, about $33 million ended up in Wadeville, Renta's personal bank account.

Meanwhile, these funds transfers were not acknowledged on BanInter's public records. Indeed, BanInter's auditors at Price Waterhouse Coopers were unaware of them until after BanInter's collapse in the spring of 2003. The transfers were booked as "loans" on a secret, parallel set of accounting records. This parallel set of books had its own computer accounting system and operated as a "bank within a bank." Only transactions between entities controlled by Baez-Figeroa were kept on the parallel books, known within the bank as the "VP Portfolio."

7

Of course, the "loans" in the VP Portfolio were treated differently from other loans by BanInter. Normally, a credit committee would assess the viability of a loan before approving it, and it would appear on the public books. But the VP Portfolio "loans" to Bankinvest were approved solely by Marcos Baez-Cocco, BanInter's Executive Vice President, and booked on the secret parallel accounting system at his direction. In addition to the surreptitious booking, there were also irregularities about the interest rates attached to these "loans." The promissory notes (described below) which ostensibly corresponded to the "loans" to Bankinvest were sometimes recorded in the parallel bank at different interest rates than the notes stated on their face. In fact, some were recorded as zero percent loans. But once the Dominican government attempted to arrange a merger between BanInter and Banco del Progreso, the VP Portfolio loans were hurriedly moved to the public books and, at Baez-Cocco's direction, were all given a twelve percent interest rate. Public acknowledgment of the VP Portfolio loans significantly altered BanInter's balance sheet.

Renta maintained that he did not know about the parallel books.

*C. The Notes*

Each transfer of funds described above corresponded to a promissory note, or a similar Dominican instrument called an unica de cambio, signed by Renta on

8

behalf of Bankinvest.[6]  In other words, each note ostensibly promised to repay[7] the same amount as one of Renta's requests for funds or security from BanInter.  The notes ostensibly obligated Bankinvest to repay BanInter the same amount BanInter had just transferred to Bankinvest, or which it eventually paid a creditor on behalf of Bankinvest.  The promises to repay were undertaken by Bankinvest even when BanInter transferred the requested funds to Interduty's accounts, not Bankinvest's.

The Commission argued that these notes were shams intended to "paper the file," that is, to give the transactions the appearance of legitimacy.  Sufficient record evidence supports this characterization that a reasonable jury could agree.  First, none of the notes were ever repaid.  Moreover, Renta acknowledged that most of the notes were not signed on the date indicated.  Rather, the dozens of notes were signed mostly in two batches – one in 2000 or 2001, the other in November or December 2002 – and not as the proceeds of each "loan" were disbursed.  In contrast, the funds to which the notes corresponded were disbursed

---

[6] Renta argued that, given the frequency with which money moved between BanInter and the other entities at issue, the notes did not necessarily correspond to the bank transfers.  There was ample evidence from which the jury could reject this conclusion.  Most importantly, the notes were dated to appear close in time to the transfers, even if Renta did not sign them on the day indicated, and the notes typically were for the identical amount as the corresponding transfer.

[7] These promissory notes form the basis for the RICO predicate acts of mail and wire fraud, the Commission arguing that Renta lacked any intent to repay the notes at the time they were endorsed and transmitted.

at irregular intervals over a three year period. Thus, the jury could conclude that most of the notes were signed in a signing spree, rather than, as Renta stated, signed in the ordinary course of business. Additionally, Renta testified that under Dominican law an unica de cambio must be secured by collateral, but that he did not know if the unicas he signed on behalf of Bankinvest were collateralized. No evidence was produced that any collateral existed. The unlawful lack of collateral contributed to the plausibility of the inference, invited by the Commission and drawn by the jury, that the notes were highly irregular transactions at a minimum. Finally, Renta admitted that he, or his subordinates acting at his direction, frequently used funds he requested from BanInter for a purpose other than that stated in the request. For example, Renta admitted that even when he stated to BanInter that requested funds were to be used to pay on a letter of credit for which Bankinvest was a guarantor, he would use the funds for some other purpose if he thought it more pressing. Given Renta's admitted disregard of business formalities and the suspicious circumstances under which the notes issued, the jury could have permissibly concluded that the notes were intended to paper the file.

*D. The Currency Exchange Transfers*[8]

In addition to the transfer-and-note looting scheme, Renta was involved in a

---

[8] These transactions formed the basis for the claim under Florida's Uniform Fraudulent Transfer Act. See Fla. Stat. § 726.101 et seq.

separate scheme that caused $10.5 million in losses to BanInter as a result of currency exchange overdraft transactions. In these transactions, Renta wrote checks from Bankinvest's peso-denominated account at BanInter to the Quiseyana currency exchange in the Dominican Republic. Most of the checks were certified; that is, BanInter guaranteed that there were sufficient funds in Bankinvest's account for the transaction, and if there were not, it promised to cover the difference. Once the checks were taken to Quiseyana, it cashed the checks, converted the funds into dollars, and transferred the funds to Wadeville. Because Bankinvest was overdrawn, BanInter supplied the funds. In the seven day period between March 20 and 26, 2003, Renta endorsed $10.5 million of transfers in this pattern.

*E. Characterizing the Transfers*

As noted, Renta did not dispute that he endorsed the funds transfers and the notes. Rather, he contends the transfers to him represent repayment of money he personally advanced to help turn around the duty free stores. Thus, the central factual dispute in the case is whether these transfers were bona fide loan payments or mere looting.

Importantly in this regard, Bankinvest changed ownership during the time periods at issue, as Bankinvest was sold by Renta to BanInter. The sale and

merger documents are significant evidence concerning the nature of the transactions at issue. Further background is necessary to understand why.

Before the events at issue, BanInter had made loans to the duty free stores controlled by Baez-Figueroa. The stores were financially distressed, however, and were having difficulty repaying the loans. In 1997, Baez-Figueroa sought Renta's help in restoring their profitability. At that time, each of the duty free stores was owned by a separate corporation controlled by Baez-Figueroa; at some later point they were consolidated into one company, Interduty. When Renta was brought in to turn around the stores in 1997, he needed to improve their creditworthiness. He testified that he used Bankinvest, which had good credit, to borrow money on behalf of Interduty in order to secure more favorable financing for the stores. Bankinvest also obtained an equity stake in Interduty. Thus, Bankinvest was carrying debt arising from loans for the benefit of Interduty when Renta sold Bankinvest (including its ownership stake in Interduty) to Baez-Figueroa in August 2001.

Critically, Renta also alleges that some of that debt was to him; that is, he contributed substantial amounts of personal capital to the duty free stores venture. Thus, the transfers of funds from BanInter to Bankinvest and Interduty,[9] which

---

[9] When Bankinvest was sold to Baez-Figueroa, it assumed Interduty's debts. Renta directed BanInter to debit Bankinvest's account in the amount of some $37.6 million, which was

typically found their way into Renta's hands, represented a repayment of loans he made. Renta further maintained that he and Baez-Figueroa contemplated this arrangement whereby Renta could inject or remove personal funds as needed in his discretion. Further, Renta maintained that this arrangement was essentially a gentlemen's agreement between himself and Baez-Figueroa, consummated on a handshake and not reduced to writing. Of course, if the jury believed his testimony, it should have found for Renta, because the funds transfers would be payments of bona fide liabilities.

If Renta injected personal funds into the duty free store venture, Bankinvest would indeed have substantial liabilities to him. Thus, one would expect the documents consummating the sale of Bankinvest to Baez-Figueroa to recognize these obligations. They do not, or at least, there was sufficient evidence for the jury to reject this characterization. The sale documents do not specifically list the existence or amount of any debts owed by Bankinvest to Renta. Rather, the agreement provided that Renta represented that Bankinvest's only liabilities were

---

used to pay off Interduty's debts. Because Bankinvest was overdrawn, that amount then became a liability of Bankinvest to BanInter, which was assumed by Bankinvest's purchaser, Baez-Figueroa. Renta admitted that he did not know at the time he ordered the debit whether Bankinvest's account at BanInter had sufficient funds to cover this transaction, but stated that he assumed it did, because (according to Renta) BanInter asked him to use Bankinvest to pay Interduty's liabilities in this fashion.

    Not coincidentally, by the time of trial, Renta again controlled the duty free stores, which had $37 million less debt than when Renta originally took them over.

13

(i) those to BanInter or related entities,[10] including Interduty, and (ii) credit obligations with other banks directly or indirectly guaranteed by BanInter. The agreement did not specifically state that Bankinvest owed Renta or Wadeville $30 million. Renta tries to argue that the agreement indirectly referenced this alleged liability, because it noted that the sale was subject to liabilities related to Interduty, which included the alleged liability to him. But the sale documents hardly compel this conclusion, and the jury was free to disbelieve Renta's characterization of these transactions. The Bankinvest sale documents state that the company had liabilities related to Interduty, but they do not state that any of those liabilities are to Renta. At best, the sale documents are ambiguous, and did not compel the court or the jury to accept Renta's story.

Renta also made numerous inconsistent or implausible statements which may have undermined his credibility in stating that Bankinvest owed him money. For example, he admitted telling inconsistent stories about the purposes of the funds transfers – telling BanInter and TIBOM that they were to pay on letters of credit for which Bankinvest was liable, but frequently transferring funds to Wadeville, his personal expense account, or to Interduty, which then transferred them to Wadeville. And it appears Renta never represented to BanInter that the

---

[10] It is important to note that the sale documents specifically state that Bankinvest has overdraft liabilities to BanInter.

14

funds he requested were repayment of loans by him. Renta also stated that he did not need documentation concerning his injection of funds into the duty free stores because he had adequate collateral for the loans, namely, shares of the duty free stores. But the evidence showed that Renta was required to relinquish those shares as collateral for another loan. In short, although the jury would have been free to accept Renta's testimony that the transfers to him were payments of loans he made to the duty free stores, there were also ample grounds for it to reject this characterization of the transactions.

Thus, because there was a sufficient basis for the jury to conclude that the funds transfers did not represent repayment of loans by Renta to the duty free stores, the jury could permissibly find that Renta had no right to the funds. As explained in part II, this affects the analysis of the sufficiency of the evidence on the RICO claims.

*F. The Fallout*

TIBOM officials became interested in suspicious account activity at Bankinvest in October 2002. They approached Renta, who in the process of explaining the account activity stated that he maintained financial and operational control of Bankinvest "pursuant to an agreement with other shareholders."

Once it became evident that BanInter was in financial distress, there was

15

allegedly an attempted merger with Banco del Progreso, another Dominican bank, which was encouraged by the Dominican government. Renta played a part in the negotiations. The merger was never consummated, but Renta argues that the merger documents support his theory of the case. This is because in the documents, Baez-Figueroa acknowledged his personal liability on $45 million in liabilities of Bankinvest and Interduty to BanInter. (As the funds transfers effectively changed Bankinvest's alleged liability to Renta into a Bankinvest liability to BanInter, Baez-Figueroa's acknowledgment supposedly validated the existence of a Bankinvest debt to Renta.) But in the merger documents Baez-Figueroa did not acknowledge liability on all of Bankinvest's debt, and the damages sought here encompass the amount he did not acknowledge. The merger documents do not help Renta.

Ultimately, BanInter collapsed in the spring of 2003. This suit followed in 2004. It was accompanied by parallel civil and criminal proceedings against Renta, Baez-Figueroa, and Baez-Cocco in the Dominican Republic.

## II.

On appeal, Renta[11] argues (i) that the Commission's RICO claims are not ripe, (ii) that RICO does not apply extraterritorially or does not apply to the

---

[11] We use "Renta" to refer to both appellants, as Wadeville is controlled by Renta and is not separately represented.

16

putatively extraterritorial conduct at issue here, (iii) that he should have been granted judgment as a matter of law on the RICO claims, and (iv) that the case should be dismissed, or the judgment remitted, for failure to plead fraud with particularity. We review these issues de novo.[12]

Renta also argues (v) that the entire case should have been dismissed in favor of a Dominican forum, and (vi) that post judgment relief is warranted based on newly-discovered evidence. We review these decisions for abuse of discretion.[13]

**III.**

*A. RICO Ripeness*

Renta first argues that before the Commission can sue him under RICO, it must pursue any contractual remedies under the promissory notes against Baez-Figueroa. Baez-Figueroa is the allegedly responsible party because when he bought Bankinvest, he assumed its liabilities to BanInter. Although Renta labels

---

[12] See Maiz v. Virani, 253 F.3d 641, 654 (11th Cir. 2001) (RICO standing); Reahard v. Lee Cty., 30 F.3d 1412, 1415 (11th Cir. 1994) (Article III ripeness); United States v. MacAllister, 160 F.3d 1304, 1306-07 (11th Cir. 1998) (extraterritorial application of a statute); Action Marine, Inc. v. Continental Carbon Inc., 481 F.3d 1302, 1309 (11th Cir. 2007) (judgment as a matter of law); United States v. R & F Properties of Lake County, Inc., 433 F.3d 1349, 1355 (11th Cir. 2005) (denial of motion to dismiss).

[13] See Ford v. Brown, 319 F.3d 1302, 1308 (11th Cir. 2003) (forum non conveniens); Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1287 (11th Cir. 2000) (post-judgment relief under Rule 60).

his argument lack of standing and some cases use the same language,[14] he is really arguing that the Commission's claims are unripe – that is, its damages are too uncertain for a claim to have accrued – because it might get some of its money back elsewhere. Renta relies chiefly on Second Circuit caselaw concluding that a RICO plaintiff's damages must be "clear and definite" before a claim accrues. See, e.g., Denney v. Deutsche Bank AG, 443 F.3d 253, 267 (2nd Cir. 2006) (citation omitted). He argues this heightened standard of certainty in pleading and proving damages prevents accrual of these claims, because BanInter has not yet reached a net loss figure by collecting on the debts.

This argument is unpersuasive. First, our opinion in Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1478-79 (11th Cir. 1991), arguably rejects Renta's premise, as it permits RICO claims even when a breach of contract claim would also lie against the RICO defendant. Other circuits have rejected the "clear and definite" standard for accrual of a RICO claim outright, holding that a claim may accrue even when the amount of loss may be reduced by other lawsuits. These courts hold that the possibility of recovery on other claims affects the amount of

_____

[14] RICO standing is really just a heightened proximate causation standard, as it requires a claimant to prove that he was injured in his business or property "by reason of" the RICO violation. 18 U.S.C. § 1964(c); First Nationwide Bank v. Gelt Funding Grp., 27 F.3d 763, 767 (2nd Cir. 1994) (RICO standing requires predicate acts, injury to business or property, and causation). But the construction urged by Renta that damages must be "clear and definite," Denney, 443 F.3d at 267 (citation omitted), although sometimes stated as a standing requirement, is better framed as one of ripeness.

RICO damages, not the accrual of the RICO claim.  See, e.g., Grimmett v. Brown, 75 F.3d 506, 516-17 (9th Cir. 1996).  Even assuming without deciding that the Second Circuit's "clear and definite" standard is the correct one and is consistent with Arabian American Oil, it does not require the metaphysical certainty in damages that Renta suggests, and he could not obtain relief thereunder.  Applying the "clear and definite" standard, the Second Circuit has concluded that the mere possibility of a state law claim for fraud or breach of contract does not necessarily render RICO claims predicated on fraud unripe.  This is particularly true when the underlying debt is unsecured and other recovery is unlikely because the defendant has stripped a corporate defendant of assets.  GICC Capital v Technology Finance Grp., 30 F.3d 289, 293 (2nd Cir. 1994).  (Contrast that situation to one where a secured debtor-plaintiff has not yet foreclosed on collateral, meaning damages have not yet been incurred or are not ascertainable with the requisite clarity.  See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 136-38 (2nd Cir. 2003), and First Nationwide Bank, 27 F.3d at 768-69.)

In other words, there is no per se rule – in this Circuit, the Second Circuit, or elsewhere – that a plaintiff must pursue every other avenue of recovery, such as realization on collateral or claims for fraud or breach of contract, before his RICO claim is ripe.  Nor is there a per se rule to the contrary.  Rather, whether a plaintiff

19

must pursue other remedies before a RICO claim depends on whether those other contingencies are sufficiently likely to mitigate the plaintiff's loss that damages in the RICO case cannot be ascertained, or may not have occurred at all. RICO need not necessarily be the claim of last resort, but neither can a plaintiff seek to treble damages that he did not actually incur.

With these principles in mind, we do not believe the Commission's claim is unripe simply because the Commission has not pursued contractual remedies, if any, against Baez-Figueroa. First, the notes probably are not enforceable contracts; they are shams lacking consideration. The notes were issued under highly irregular circumstances, BanInter never took steps to enforce them against Bankinvest before the bank's collapse, and assuming the notes were signed in a signing spree, many of the bank transfers to which they ostensibly corresponded could not have been consideration for the notes. The transactions are more plausibly characterized as conversion than fraudulent inducement of unsecured loans. Even assuming the notes created enforceable contract rights, the damages BanInter suffered at Renta's hands were not so uncertain that threshold dismissal was warranted. Although the ongoing Dominican civil proceedings may result in possible recovery against Baez-Figueroa, who has significant personal assets but is also in jail and facing other claims from the collapse of BanInter, this mere possibility does not render the

20

amount of damages unclear. This is not a case like Motorola, 322 F.3d at 136-38, or First Nationwide Bank, 27 F.3d at 768-69, where it was virtually certain that the amount of a fraudulently induced debt would be reduced by foreclosure on collateral. Recovery on the notes is, at best, a remote and highly contingent possibility. These RICO claims were ripe enough to be tried, under any standard.

*B. Extraterritoriality*

Next, Renta argues that the RICO claims should be dismissed because RICO cannot reach extraterritorial conduct, or at least, cannot reach the "extraterritorial" conduct at issue here. Although Renta explains his argument in terms of "choice of law," we believe the issue is properly considered through the lens of extraterritoriality, because "[w]here a federal statute is involved . . . a choice of law analysis does not apply in the first instance. The initial question, rather, is whether Congress intended the statute in question to apply to conduct occurring outside the United States. This is a question of statutory interpretation . . . not a question of choice of law." Orion Tire Corp v. Goodyear Tire & Rubber, 268 F.3d 1133, 1137 (9th Cir. 2001); see also United States v. Plummer, 221 F.3d 1298, 1304-06 (11th Cir. 2000) (whether a statute applies extraterritorially is a matter of statutory interpretation).

The first question, one of first impression in this Circuit, is whether RICO

applies extraterritorially at all. Courts have divided over this issue. Some have concluded that RICO does not apply extraterritorially, essentially because Congress made no explicit statement to that effect. See, e.g., Jose v. M/V Fir Grove, 801 F. Supp. 349 (D. Or. 1991). The more widely accepted view, and the one we adopt today, is that RICO may apply extraterritorially if conduct material to the completion of the racketeering occurs in the United States, or if significant effects of the racketeering are felt here. See, e.g., North-South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2nd Cir. 1996); Poulos v. Caesar's World, Inc., 379 F.3d 654, 663-64 (9th Cir. 2004) (citations omitted).

It is clear that the effects test is not satisfied here. No United States person or business harmed by this scheme has been brought to our attention. The effects were felt predominantly in the Dominican Republic, where BanInter was based and where the majority of its depositors and creditors were located. Extraterritorial jurisdiction, if it exists, must derive from the conduct test.

We also agree with the North-South court that use of the conduct test to assert extraterritorial RICO jurisdiction must be undertaken with particular care. The conduct test is borrowed from the securities laws, but American courts will not exercise jurisdiction over a transnational securities fraud suit if the conduct occurring in the United States is preparatory or far removed from the

22

consummation of the fraud.  See North-South Fin., 100 F.3d at 1052-53.  Likewise, extraterritorial RICO jurisdiction may not be appropriate when conduct occurring in or directed at the United States is not central to consummation of the racketeering, for example, where the sole nexus is utilization of American mail or wires to prepare for or cover up a fraud scheme perpetrated by foreigners against other foreigners.  Id.

But that is not this case.  Significant amounts of conduct in furtherance of the RICO conspiracy occurred in both the United States as well as the Dominican Republic.  Indeed, the conduct occurring in, or directed at, the United States in this case was not an insubstantial or preparatory part of the overall looting scheme, but the actual means of its consummation.  This scheme was carried out by directing transfers of funds to and from accounts at American banks, including the American bank accounts of the victim, BanInter, and of one RICO enterprise, Bankinvest.  Among its primary goals was enrichment of an American entity, Wadeville, controlled by an American defendant.  We have no doubt that under these circumstances, Congress would intend BanInter to have recourse to American courts and remedies.

C. *Judgment as a Matter of Law*

Renta next argues that he is entitled to judgment as a matter of law on all

claims. Three RICO claims were raised: one under § 1962(a), which prohibits investing the proceeds of a pattern of racketeering activities in an enterprise, and two RICO conspiracies, one conspiracy to violate § 1962(a), and also one conspiracy to violate § 1962(c), which prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. BanInter was the RICO enterprise for the § 1962(c) conspiracy, and Bankinvest was the enterprise for the other two claims. The alleged predicate acts were mail and wire fraud (based on transmission of the notes) as well as money laundering and interstate transportation and receipt of stolen property (based on the funds transfers). The jury found for the Commission on all three counts.

Renta argues that the Commission did not prove: (i) the existence of either conspiracy, (ii) the "investment injury" putatively required by § 1962(a), (iii) scienter as to all three RICO claims and the fraudulent transfer claim, or (iv) proximate causation as to all three RICO claims.

We conclude that the Commission adequately proved a conspiracy to violate § 1962(c), and that the full amount of damages found by the jury was proximately caused thereby. To prove a conspiracy to violate § 1962(c), a plaintiff must demonstrate that a defendant "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise" through a

24

pattern of racketeering activity. United States v. Starrett, 55 F.3d 1525, 1543 (11th Cir. 1995) (citation omitted). An agreement to participate in a RICO conspiracy may be shown either by proving "an agreement on the overall objective of the conspiracy" or by showing that the defendant agreed to commit two predicate acts. United States v. Browne, 505 F.3d 1229, 1264 (11th Cir. 2007) (citation omitted). The existence of an agreement, as well as its objective, may be inferred from circumstantial evidence demonstrating "that each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." Id. (citation omitted). But this does not require proof that "each conspirator agreed with every other conspirator . . . [or] was aware of all the details of the conspiracy." Starrett, 55 F.3d at 1544. Indeed, participation in a conspiracy may be inferred merely from acts which furthered its object. United States v. Kopituk, 690 F.2d 1289, 1323 (11th Cir. 1982) (citation omitted).

Here there is no need to infer the existence of an agreement. Renta represented to TIBOM that he controlled and operated Bankinvest, and that he did so pursuant to an agreement with other shareholders. Because the evidence showed Bankinvest existed in large measure to serve as a conduit for BanInter funds headed for Wadeville and other entities controlled by the conspirators, the

25

jury could properly infer that the agreement's scope extended to the conduct of BanInter's affairs as well.

Moreover, there was abundant circumstantial evidence from which the jury could infer that the object of the agreement was to conduct BanInter's affairs through a pattern of racketeering activity, to wit, a pattern of diverting money from BanInter through transactions constituting the transmission and receipt of converted funds.[15] In fact, the conspiracy largely achieved its goal. Millions in BanInter funds to which Renta had no right were transferred to his control. Even though Bankinvest was perpetually overdrawn, Renta's transfer requests were always honored by BanInter, precisely because of the business relationships and agreements between Renta and BanInter insiders. The jury could certainly conclude that the acknowledged agreement between Renta and Baez-Figueroa was what kept the money flowing. Indeed, it would be difficult to conclude otherwise. It is unlikely (to say the least) that BanInter would permit an ordinary depositor to rack up massive overdraft positions and fail to make any payments on "loans" over

---

[15] Although Renta's conduct may have violated other predicate statutes, the most obvious predicate acts on this record are violations of 18 U.S.C. §§ 2314-15, which prohibit transmission and receipt of converted funds, respectively. Section 2314 provides that "whoever . . . transmits, or transfers in interstate or foreign commerce any . . . money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud" commits a felony. Section 2315 provides that "whoever receives . . . any . . . money of the value of $5,000 or more . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken," commits a felony.

26

a period of several years, without suffering any attempts at collection or even a tightening of credit. But this is precisely what BanInter tolerated from Bankinvest, and it did so because of an agreement between Renta and the two Baezs about how to operate BanInter.

Renta explained his indifference to BankInvest's overdrafts by his relationship with Baez-Figueroa: he stated that he thought Baez-Figueroa, as owner of Bankinvest and controlling shareholder of BanInter, would take care of any overdrafts. Renta argued that because Bankinvest owed him money and, like BanInter, was controlled by Baez-Figueroa, he was merely converting Bankinvest's liability to him to a liability to BanInter, at Baez-Figeroa's request. But for that argument to succeed, Bankinvest would have had to owe Renta money. The jury found it did not, and quite reasonably so.

Further, contrary to his protestations, Renta was not an unwitting participant in the looting of BanInter. He protests that he lacked the requisite scienter for the RICO predicate acts; instead, he argues he acted in good faith, as he did not know that BanInter was funding his transfer requests with overdrafts rather than, as he expected, personal funds of Baez-Figueroa. The predicate acts alleged here – mail and wire fraud, transportation of converted funds, and money laundering – each require proof of scienter. <u>Republic of Panama v. BCCI Holdings (Luxembourg)</u>

27

SA, 119 F.3d 935, 948-49 (11th Cir. 1997) (citations omitted).  Transportation and receipt of converted funds in particular requires knowledge that the funds were converted or taken by fraud.  Id.  Under the circumstances, Renta's knowledge (or deliberate ignorance) in this regard was a jury question.  The jury could very well have disbelieved Renta's testimony that he never knew about Bankinvest's negative account balances, not only because it could have made an adverse credibility determination, but also because of the statement in the Bankinvest sale documents signed by Renta that Bankinvest did, in fact, have overdraft liabilities to BanInter.  Moreover, Renta's participation in "papering the file" with the notes further contributes to an inference of scienter with respect to his receipt of the funds.  In other words, Renta knew that Bankinvest was receiving BanInter's money in the wire transfers rather than its own, and when asked to participate in a cover up by signing sham promissory notes, he obliged.  An inference of scienter is perfectly plausible on this record.

In sum, the record supports the jury's conclusion that Renta was a participant in a conspiracy to conduct the affairs of BanInter through a pattern of transactions which constituted transmission and receipt of converted funds, that the transfers at issue were carried out pursuant to that agreement and succeeded because of it, and that Renta possessed the requisite scienter.

28

Renta also asserts that he was entitled to judgment as a matter of law based on the equitable defense of *in pari delicto*. Under this defense, "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1152 (11th Cir. 2006) (citation omitted) (recognizing that *in pari delicto* is a defense to RICO claims). Renta argues that Baez-Figueroa, a co-conspirator, was the controlling shareholder of BanInter and that his participation in the wrongdoing is appropriately imputed to the bank, barring its recovery.

We agree with the district court that imputation of wrongdoing or guilty knowledge to BanInter should not occur as a matter of law here. Imputation is inappropriate where a jury could permissibly conclude that an agent (here, Baez-Figueroa) was engaged in fraud or self-dealing adverse to a corporate principal (here, BanInter). See FDIC v. Lott, 460 F.2d 82, 88 (5th Cir. 1972)[16] (bank officer/director's knowledge not imputed to bank where he fraudulently dealt with bank in his own interest); see also Restatement (Third) of Agency § 5.04; Bank of China v. NBM LLC, 359 F.3d 171, 179 (2nd Cir. 2004).

Renta argues that *in pari delicto* necessarily applies because Baez-Figueroa

---

[16] Pursuant to Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this former Fifth Circuit decision is binding precedent.

was the controlling shareholder of BanInter. This argument confuses the *in pari delicto* defense itself with the agency law principles that permit it to be asserted against a corporate plaintiff. As Renta argues, we have recognized that *in pari delicto* doctrine bars recovery by a corporation whose sole shareholder is engaged in wrongdoing, Edwards, 437 F.3d at 1149, and Renta cites other cases permitting the defense to be asserted against a corporation whose controlling shareholder engaged in the wrongdoing which forms the basis of the plaintiff's claims. See, e.g., Nisselson v. Lernout, 469 F.3d 143, 157 (1st Cir. 2006). The defense is, however, not available *because* of the wrongdoer's ownership of a plaintiff corporation, but because of his agency relationship with it. Indeed, wrongdoing by a mere employee might be a sufficient basis for the defense in some cases. The point is that corporations act only through their agents, and an agent's guilty conduct and knowledge is typically imputed to his principal. Once the agent's knowledge and conduct are imputed to the corporation, the corporation is considered a wrongdoer; only then does *in pari delicto* become a defense against it. The question here is not whether *in pari delicto* would bar recovery by BanInter if it is a wrongdoer – Edwards is clear that it would – but whether BanInter is a wrongdoer at all, that is, whether the wrongdoing of its agents should be imputed to it. The adverse interest exception addresses this question, and it typically

30

presents a jury question.  See Bank of China, 359 F.3d at 179.

The district court held, and our review of the record confirms, that there was sufficient evidence from which the jury could conclude that Baez-Figueroa acted adversely to BanInter's interests, indeed, looted it alongside Renta.  Thus, imputation of Baez-Figueroa's wrongdoing to the bank would be inappropriate, and Renta's defense fails.  It would be perverse indeed if the Commission was unable to pursue a claim on behalf of BanInter's other stakeholders solely because some of the people who stole from it were insiders in a position to carry out the fraud!

Because the § 1962(c) conspiracy provides a sufficient evidentiary basis to affirm the judgment in full, and because Renta's *in pari delicto* defense fails, we need not reach Renta's other arguments about the sufficiency of the evidence.

*D. Particularized Pleading*

Renta next argues the case should be dismissed, or the judgment remitted, for failure to plead the predicate acts of fraud with particularity, as the verdict was based on numerous fraudulent promissory notes not pleaded in the complaint.

When a RICO claim is based on predicate acts involving fraud, those predicate acts must be pleaded with particularity, in accordance with Fed. R. Civ. P. 9(b).  See, e.g., Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309,

31

1316-17 (11th Cir. 2007); see also 5 Wright & Miller, Federal Practice and Procedure § 1251.1.  We now hold that RICO predicate acts not sounding in fraud need not necessarily be pleaded with the particularity required by Fed. R. Civ. P. 9(b).  When fraud is pleaded as an alterative claim, the non-fraud claims in the complaint need not be pleaded with particularity unless the same misrepresentation forms the basis of both the fraud and non-fraud claim.  Wagner v. First Horizon Pharmaceutical Corp., 464 F.3d 1273, 1277-78 (11th Cir. 2006) (requiring particularized pleading when the same misrepresentation supports fraud claims under Rule 10b-5 and non-fraud claims under § 11 of the Securities Exchange Act).  The rule should be the same when the alternative theory of the case is a predicate act rather than an independent claim.

Applied here, these principles suggest that the transactions underlying the verdict need not have been pleaded with particularity because the non-fraud RICO predicate statutes do not require proof of a misrepresentation.  The verdict was based on $48.5 million in wire transfers to Bankinvest, Interduty, and Groupwide Florida, and the $10.5 million in currency exchange transfers to Wadeville.  There was a sufficient evidentiary basis to conclude that these transfers by themselves violated 18 U.S.C. § 2314-15, regardless of whether the related promissory notes or transfer requests would also support a wire fraud claim.  Because proving a

32

violation of the stolen property statutes does not require proof of a misrepresentation,[17] and because the evidence was sufficient to sustain the verdict based on these non-fraud predicate acts, no error has been shown.

*E. Forum Non Conveniens*

Renta next argues the entire case should have been dismissed for forum non conveniens. That doctrine authorizes a court with venue to decline to exercise its jurisdiction when the parties' and court's own convenience, as well as the relevant public and private interests, indicate that the action should be tried elsewhere. Ford, 319 F.3d at 1307. Domestic plaintiffs enjoy a strong presumption that their chosen forum is convenient; foreign plaintiffs, such as the Commission, enjoy a weaker presumption. Leon v. Million Air, Inc., 251 F.3d 1305, 1311 (11th Cir. 2001). A defendant seeking dismissal for forum non conveniens bears the burden of demonstrating (i) that an adequate alternative forum is available, (ii) that relevant public and private interests weigh in favor of dismissal, and (iii) that the plaintiff can reinstate his suit in the alternative forum without undue inconvenience

---

[17] When a violation of § 2314 is based on transmission of funds, the statute only requires proof that the defendant transmitted more than $5,000 in interstate or foreign commerce, and that the defendant knew the money was stolen, converted, or obtained by fraud. Cf. United States v. Herring, 602 F.2d 1220, 1224 (5th Cir. 1979); Pereira v. United States, 347 U.S. 1, 9 (1954). Likewise, proof under the receipt of stolen property statute requires that a defendant receive $5,000 or more which crossed a state or United States boundary after having been stolen or converted, and that the defendant know the funds were stolen or converted. 18 U.S.C. § 2315. Neither statute requires proof of a misrepresentation.

or prejudice. <u>Membreno v. Costa Crociere SPA</u>, 425 F.3d 932, 937 (11th Cir. 2005). Pertinent private interests of the litigants include relative ease of access to evidence in the competing fora, availability of witnesses and compulsory process over them, the cost of obtaining evidence, and the enforceability of a judgment. <u>Ford</u>, 319 F.3d at 1307 (citing <u>Gulf Oil v. Gilbert</u>, 330 U.S. 501, 508-09 (1947)). Relevant public interests include the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally. <u>Id.</u>

Finally, the Commission urges us to adopt the rule of some courts requiring a defendant to show "great prejudice" to succeed on a post-trial forum non conveniens motion, even if it is merely a renewal of a denied pre-trial motion where "great prejudice" need not be shown. <u>See</u> <u>Zelinski v. Columbia 300 Inc.</u>, 335 F.3d 633, 643 (7th Cir. 2003); <u>McLennan v. American Eurocopter</u> Corp. Inc., 245 F.3d 403, 423 (5th Cir. 2001) (citing <u>In Re Air Crash Disaster Near New Orleans</u>, 821 F.2d 1147, 1168 n.35 (5th Cir. 1987) <u>(en banc)</u>, <u>vacated on other grounds sub nom. Pan American World Airways Inc. v. Lopez</u>, 490 U.S. 1032 (1989), <u>opinion reinstated on remand</u>, 883 F.2d 17 (5th Cir. 1989)). But we need not decide whether to adopt a "great prejudice" requirement for post-trial motions because Renta has not made the other showings necessary for relief.

34

Our review of the district court's orders addressing forum non conveniens reveals no abuse of discretion. Although a Dominican forum was available and adequate, Renta has not shown error in the district court's conclusion that the public and private factors were in equipoise and, thus that the presumption in favor of the plaintiff's chosen forum should govern.

First, we cannot say the district erred in finding the public factors in equipoise. Although the effects of the fraud were felt mostly in the Dominican Republic, American law properly governs BanInter's claims, militating in favor of an American forum.

As for private factors, we again agree with the district court. Significant amounts of evidence were located in each country. In particular, because the transactions consummating the looting were mostly carried out between U.S. banks, including BanInter's dollar-denominated accounts at U.S. banks, the "paper trail" evidence was predominantly located in the United States, as were several necessary witnesses from those banks. Renta nonetheless argues that there was an unfair evidentiary imbalance, as the district court lacked subpoena power over key documents and witnesses, including Baez-Figueroa and Baez-Cocco. The unavailability of this evidence was all the more unfair to Renta, he argues, because the Commission had access to it. The Commission replies, in essence, that Renta

35

testified to the same facts which he seeks to prove by the witnesses and documents allegedly in the Dominican Republic; thus, even assuming the evidence is as Renta describes, it would be cumulative. Fortunately, we need not speculate about the missing evidence, because the most significant documentary evidence from the Dominican Republic – Bankinvest's ledger and the reports of an audit of BanInter – are part of the record on appeal. As explained below in our analysis of Renta's motion for post-judgment relief, this was not the type of smoking gun evidence that would require retrial. We cannot say that its absence at trial so dramatically tipped the balance of interests that the district court abused its discretion in not dismissing the case. Likewise, although Baez-Figueroa and Baez-Cocco may have been available in a Dominican forum, we doubt that their availability so outweighs the probative value of the evidence available only in an American forum that the district court abused its discretion in maintaining jurisdiction.

*F. Post-Judgment Relief*

Renta finally argues that the district court abused its discretion in denying him post-judgment relief under Fed. R. Civ. P. 60(b)(2) based on newly discovered evidence, namely, the BanInter audit report and the ledger of Bankinvest. To obtain relief under Rule 60(b)(2), a party must show that evidence was (i) discovered after trial, (ii) material, (iii) not merely impeaching or cumulative, (iv)

36

likely to produce a different result on retrial, and further that the party exercised due diligence to obtain the evidence. Waddell v. Hendry Co. Sheriff's Office, 329 F.3d 1300, 1309 (11th Cir. 2003).

This evidence was allegedly unavailable at trial because the audit report was not yet completed and the ledger was in the hands of Renta's accountant, who was not authorized to release it for reasons related to the then-ongoing Dominican proceedings. Yet the ledger and audit are not likely to produce a different result on retrial, for essentially the reasons propounded by the district court. The audit is of questionable relevance and is largely cumulative of Renta's own testimony. It certainly does not decisively establish the critical point that Renta would need to establish to obtain relief: that he was owed millions by Bankinvest.

The ledger is a closer question. Like the Bankinvest sale documents, it could be construed as consistent with Renta's theory of the case. (Renta testified to many of the facts he would seek to prove with the ledger, but because Renta's theory of the case is an implausible oral agreement for which he had no documentary proof, strong documentary support for his assertions might have changed the result.) The ledger arguably establishes more detail about Bankinvest's liabilities than Renta himself could provide. But it does not conclusively establish that Bankinvest owed Renta the millions he claimed. As

with the case of the Bankinvest sale documents, for the ledger to support Renta's theory of the case, the jury would have had to accept his characterization of particular ambiguous line items. Moreover, there are significant questions about the authenticity of the ledger. In short, with or without the ledger, this case hinged on Renta's credibility. Given the other evidence in the case, the ledger was not likely to have altered the jury's assessment of Renta's credibility, nor does it otherwise suggest that the result of a new trial would likely be different. The district court did not abuse its discretion in denying post-judgment relief.

*G. Conclusion*

Renta raises assorted other arguments, which do not merit relief or further analysis. For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**