IN THE SUPREME COURT OF NORTH CAROLINA

No.168A19

Filed 28 February 2020

CARDIORENTIS AG

v.

IQVIA LTD. and IQVIA RDS, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a)(3) from an order and opinion on defendants' motion to stay all proceedings on *forum non conveniens* grounds entered on 31 December 2018 by Judge Adam M. Conrad, Special Superior Court Judge for Complex Business Cases, in Superior Court, Durham County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 6 January 2020.

*Robinson, Bradshaw & Hinson, P.A., by J. Dickson Phillips III and Jonathan C. Krisko; and Hogan Lovells US LLP, by Catherine E. Stetson, for plaintiff.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Charles F. Marshall and Shepard D. O'Connell; Cooley LLP, by Michael J. Klisch, Joshua M. Siegel, and Robert T. Cahill for defendants.*

PER CURIAM.

AFFIRMED.

STATE OF NORTH CAROLINA

DURHAM COUNTY

CARDIORENTIS AG,

                Plaintiff,

v.

IQVIA LTD. and IQVIA RDS, INC.,

                Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 2313

**ORDER AND OPINION
ON DEFENDANTS'
PRE-ANSWER MOTIONS**

1.     Plaintiff Cardiorentis AG is a Swiss biopharmaceutical company. Its flagship drug, Ularitide, is a treatment for heart failure. In 2012, Cardiorentis enlisted IQVIA Ltd. ("IQVIA UK"), an English contract research organization, to perform a worldwide clinical trial of Ularitide with a view toward obtaining the regulatory approvals needed to market the new drug. The trial was not successful. According to Cardiorentis, the results were invalid, compromised by the inclusion of hundreds of ineligible patients. Cardiorentis blames both IQVIA UK and its North Carolina-based parent, IQVIA RDS, Inc. ("IQVIA NC"), asserting claims for breach of contract and fraud, among others.

2.     Neither IQVIA UK nor IQVIA NC has answered the complaint, instead opting to file several pre-answer motions. Defendants first ask the Court to stay all proceedings under N.C. Gen. Stat. § 1-75.12 on *forum non conveniens* grounds. (ECF No. 19.) IQVIA UK separately asks the Court to dismiss the claims against it for lack of personal jurisdiction. (ECF No. 17.) In the alternative, Defendants also seek to

dismiss all claims on the merits pursuant to North Carolina Rule of Civil Procedure 12(b)(6). (ECF No. 21.)

3. For the following reasons, the Court **GRANTS** Defendants' motion to stay all proceedings under section 1-75.12. The Court **DENIES** as moot all other requested relief.

> *Robinson, Bradshaw & Hinson, P.A., by J. Dickson Phillips III, Jonathan C. Krisko, and Morgan P. Abbott, and Hogan Lovells US LLP, by Dennis H. Tracey III and Allison M. Wuertz, for Plaintiff Cardiorentis AG.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Charles F. Marshall, Charles E. Coble, and Shepard D. O'Connell, and Cooley LLP, by Michael J. Klisch and Robert T. Cahill, for Defendants IQVIA Ltd. and IQVIA RDS, Inc.*

Conrad, Judge.

I.
BACKGROUND[1]

4. It is not clear when Cardiorentis began developing Ularitide, but by April 2010, the regulatory-approval process was underway. (*See* Compl. ¶¶ 18, 19, ECF No. 3.) Though based in Switzerland, Cardiorentis hoped to market the drug widely. It sought approvals from two of the world's key regulatory agencies, the United States Food and Drug Administration and the European Medicines Agency. (Compl. ¶ 19.) Cardiorentis completed two preliminary clinical trials before selecting IQVIA UK, an English company, to manage a Phase III trial designed to demonstrate Ularitide's safety and efficacy. (Compl. ¶¶ 1, 4, 20.)

---

[1] In this section, the Court draws from the allegations in the complaint, along with the briefs and affidavits in support of and opposition to Defendants' motion to stay.

5.     In August 2012, Cardiorentis and IQVIA UK (named Quintiles Ltd. at that time) entered into a General Services Agreement ("Services Agreement") that set out the terms for a global, multi-year trial. (Compl. ¶¶ 1, 6, 21; Mem. in Supp. Mot. Stay Ex. 2, ECF No. 20.3 ["Services Agreement"].)  IQVIA UK agreed to design and run the trial in its entirety. (Compl. ¶ 22.)  Its duties included developing the protocol that established the essential criteria for determining a patient's eligibility to participate. (Compl. ¶¶ 22(a), 30.)  IQVIA UK was also required to select all trial sites, to monitor each site to ensure compliance with the protocol, and to perform full source data verification to ensure that reported data matched the patient's original medical records. (*See* Compl. ¶¶ 22(b), 22(f), 22(f), 37, 39; Defs.' Reply Br. in Supp. Mot. Stay Ex. 3 ¶¶ 18–19, ECF No. 81.4.)  Other duties included data management, statistical analysis, and medical advisory services. (*See* Mem. in Supp. Mot. Stay Ex. 5 ¶¶ 7, 9–12, ECF No. 20.6.)  The Services Agreement is governed by English law and allows IQVIA UK to use the services of its corporate affiliates, including its parent IQVIA NC. (Services Agreement §§ 20.0; 28.0; Defs.' Mem. in Supp. Mot. Stay 4, ECF Nos. 20, 61 ["Mem. in Supp."].)

6.     Eight months after executing the Services Agreement, Cardiorentis entered into a Clinical Quality Agreement ("Quality Agreement") with IQVIA NC (named Quintiles, Inc. at that time). (Compl. ¶ 24.)  The Quality Agreement functioned as an extension of the Services Agreement, outlining processes for effective communication during the trial. (*See* Mem. in Supp. Ex. 3 § 1, ECF No. 20.4 ["Quality Agreement"].)

If the Services Agreement and Quality Agreement conflicted in any way, the Services Agreement would control. (Quality Agreement § 1.)

7. The trial appears to have been a mammoth undertaking, involving more than a hundred trial investigators, thousands of patients, and hospitals in 23 countries. (*See* Compl. ¶¶ 7, 8, 34; Defs.' Reply Br. in Supp. Mot. Stay 6, ECF No. 81 ["Reply Br."].) Over a three-year period, IQVIA UK trained the investigators and then collected, managed, and reviewed the trial data. (Compl. ¶¶ 22(c), 22(g).) Yet the trial was unsuccessful. (Compl. ¶¶ 8, 82, 84.)

8. Cardiorentis now seeks to hold Defendants responsible for the failed trial, claiming that both Defendants breached the Services Agreement and that IQVIA NC breached the Quality Agreement. (Compl. ¶¶ 91, 99.) Cardiorentis alleges, among other things, that Defendants provided inadequate training, failed to monitor the trial sites, allowed hundreds of ineligible patients to enroll, and then concealed deviations from the protocol. (*See* Compl. ¶¶ 46–49, 51.) These violations, Cardiorentis alleges, were intentional—a conscious choice to withhold resources and reduce trial costs for the purpose of inflating Defendants' stock price before a merger. (*See* Compl. ¶¶ 54–56.) In addition to its claims for breach of contract, Cardiorentis asserts claims for fraud, tortious misrepresentation, and violations of North Carolina's Unfair and Deceptive Trade Practices Act. (Compl. ¶¶ 106, 120, 130.)

9. In their pre-answer motions, Defendants contend that this case has little connection to North Carolina. They jointly seek a stay on *forum non conveniens* grounds, and IQVIA UK separately contends that this Court lacks personal

jurisdiction over it. In the event North Carolina is a proper venue, Defendants contend that the case should be dismissed anyway because the complaint fails to state a claim for relief.

10. Before responding to the motions, Cardiorentis served discovery requests geared toward venue and personal jurisdiction. (*See* ECF No. 50.) Defendants objected to those requests. After full briefing, the Court denied Cardiorentis's motion for venue-related discovery, noting that courts typically do not permit discovery before deciding *forum non conveniens*. *See Cardiorentis AG v. IQVIA Ltd.*, 2018 NCBC LEXIS 96, at *3–4, 8 (N.C. Super. Ct. Sept. 14, 2018).

11. Defendants' pre-answer motions are now fully briefed, and the Court held a hearing on November 13, 2018. (ECF No. 71.) The motions are ripe for decision.

II.
ANALYSIS

12. Defendants argue that North Carolina is an inconvenient forum and that Cardiorentis's claims should be heard, if at all, in England.[2] On that basis, they ask the Court to stay this case under section 1-75.12. Cardiorentis responds that North Carolina is not only a convenient forum but also the forum with the most substantial connection to the case.

13. Section 1-75.12 codifies the doctrine of *forum non conveniens*. If a trial court finds "that it would work substantial injustice for [an] action to be tried in a court of

---

[2] In the alternative, Defendants argue that this case should be heard in Switzerland where Cardiorentis maintains its principal place of business. (Compl. ¶ 11; Mem. in Supp. 2.) The Court need not address this alternative position because it finds, based on the parties' briefs and affidavits, that England is "a convenient, reasonable and fair place of trial." N.C. Gen. Stat. § 1-75.12(a).

this State, the judge on motion of any party may enter an order to stay further proceedings in the action in this State." N.C. Gen. Stat. § 1-75.12(a). Put another way, when it appears that this State "is an inconvenient forum and that another is available which would better serve the ends of justice and the convenience of [the] parties, a stay should be entered." *Motor Inn Mgmt., Inc. v. Irvin-Fuller Dev. Co.*, 46 N.C. App. 707, 713, 266 S.E.2d 368, 371 (1980) (citing *Silver v. Great Am. Ins. Co.*, 29 N.Y.2d 356, 361 (N.Y. 1972)).

14.     In deciding whether to grant a stay, our courts usually consider a series of convenience factors and policy considerations, including

> (1) the nature of the case, (2) the convenience of the witnesses, (3) the availability of compulsory process to produce witnesses, (4) the relative ease of access to sources of proof, (5) the applicable law, (6) the burden of litigating matters not of local concern, (7) the desirability of litigating matters of local concern in local courts, (8) convenience and access to another forum, (9) choice of forum by plaintiff, and (10) all other practical considerations.

*Lawyers Mut. Liab. Ins. Co. of N.C. v. Nexsen Pruet Jacobs & Pollard*, 112 N.C. App. 353, 356, 435 S.E.2d 571, 573 (1993) (citing *Motor Inn*, 46 N.C. App. at 713, 266 S.E.2d at 371). These factors parallel the public and private interest factors that federal courts use to decide motions premised on *forum non conveniens*. *See, e.g., Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 804–08 (4th Cir. 2013); *see also Motor Inn*, 46 N.C. App. at 713, 266 S.E.2d at 371.

15.     It is not necessary to consider each factor or to find that every factor weighs in favor of a stay. *See Muter v. Muter*, 203 N.C. App. 129, 132–33, 689 S.E.2d 924,

927 (2010); *Wachovia Bank v. Deutsche Bank Tr. Co. Ams.*, 2006 NCBC LEXIS 10, at *12 (N.C. Super. Ct. June 2, 2006).  Rather, the trial court must be able to conclude that (1) a substantial injustice would result in the absence of a stay, (2) the stay is warranted by the factors that are relevant and material, and (3) the alternative forum is convenient, reasonable, and fair.  *See Bryant & Assocs., LLC v. ARC Fin. Servs., LLC*, 238 N.C. App. 1, 5, 767 S.E.2d 87, 91–92 (2014).

16.     With these principles in mind, the Court turns to the relevant factors, beginning with Cardiorentis's choice of forum.

### A. <u>Plaintiff's Choice of Forum</u>

17.     Our courts generally begin with the presumption that a plaintiff's choice of forum deserves deference.  *See Wachovia Bank*, 2006 NCBC LEXIS 10, at *18; *see also Wordsworth v. Warren*, 2018 NCBC LEXIS 107, at *10 (N.C. Super. Ct. Oct. 15, 2018); *La Mack v. Obeid*, 2015 NCBC LEXIS 24, at *16–17 (N.C. Super. Ct. Mar. 5, 2015).  The amount of deference due, though, varies with the circumstances.

18.     When a plaintiff elects to sue outside its home forum, its "choice deserves less deference."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).  This is not to disfavor foreign litigants; there is simply less reason to believe that a litigant would choose a foreign forum for reasons of convenience.  As the United States Supreme Court has observed, "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient.  When the plaintiff is foreign, however, this assumption is much less reasonable."  *Id.* at 255–56.

19. That is the case here. Cardiorentis, a Swiss company, brought this suit thousands of miles from its home. Absent a contrary showing, it is not reasonable to assume that Cardiorentis chose North Carolina because of its convenience.

20. Cardiorentis argues that it was faced with a choice between two inconvenient forums, North Carolina and England, and that it chose North Carolina as the more convenient of the two. (*See* Opp'n 2.) The Court is not persuaded. It appears that Cardiorentis conducted its pre-suit communications through English counsel. (*See* Mem. in Supp. Ex. 7 ¶ 1.8, ECF No. 20.8.) The decision to handle pre-suit activity in England but then to bring suit in North Carolina hints at forum shopping rather than convenience. Indeed, in other filings, Cardiorentis itself has complained about the inconvenience that results from a six-hour time difference and the associated complexity of cross-Atlantic communications. (*See* Pl.'s Resp. Defs.' Mot. Extend Time ¶ 3, ECF No. 78.)

21. The Court therefore gives reduced deference to Cardiorentis's choice of forum. This factor weighs against granting a stay, but only slightly.

### B. Location of Witnesses and Evidence

22. The clinical trial for Ularitide was a global undertaking, involving doctors, patients, and hospitals around the world. As a result, this litigation is likely to involve a number of witnesses and reams of evidence from a variety of locations—an important consideration because "the touchstone of *forum non conveniens* analysis is convenience." *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983).

1.  Convenience of Witnesses and Convenience and Access to Another Forum

23.    The location of witnesses is "always a key factor in forum non conveniens cases." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 66 (2d Cir. 1981).  The Court must consider not only the number of witnesses but also the materiality and importance of the witnesses.  *See, e.g.*, *Bos. Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1209 (9th Cir. 2009); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1396 (8th Cir. 1991).

24.    Materiality turns on the nature of Cardiorentis's allegations.    In its complaint, Cardiorentis attributes the trial's failure primarily to the enrollment (and subsequent concealment) of patients who did not meet the trial protocol.  (*See* Compl. ¶¶ 7, 8, 49, 51.)  This protocol established the criteria by which a patient was included in or excluded from the trial.  (Compl. ¶¶ 31–32.)  Enrollment of ineligible patients could affect the validity of the trial data, and IQVIA employees and affiliates were required to report any protocol deviations to Cardiorentis.  (*See* Compl. ¶¶ 33, 35; Reply Br. Ex. 3 ¶¶ 12, 15.)  IQVIA UK also performed source data verification to ensure that the reported data matched patient records.  (*See* Reply Br. Ex. 3 ¶¶ 18–19.)  Defendants' alleged failure to identify and report protocol deviations and perform source data verification forms the basis of this suit.

25.    These duties were largely performed by three groups of potential witnesses: the trial investigators, the Clinical Research Associates ("CRAs"), and the Clinical Project Management Team ("CPM team").  (Reply Br. 5–6.)  The investigators are the doctors who treated the patients at each study site.  (Reply Br. Ex. 3 ¶ 7.)  They

screened potential trial participants and determined a patient's eligibility. (Compl. ¶¶ 30, 34; Reply Br. Ex. 3 ¶ 7.) The CRAs, in turn, had responsibility for training the investigators, overseeing them, and monitoring the trial sites, along with identifying protocol deviations and performing source data verification. (Reply Br. Ex. 3 ¶¶ 12, 15, 18–19.) The CPM team had overall responsibility for managing and operating the trial, including oversight responsibility for training investigators, monitoring sites, and addressing protocol deviations. (Mem. in Supp. Ex. 5 ¶ 8; Reply Br. Ex. 3 ¶¶ 7, 14.) In short, these individuals have personal knowledge of the conduct giving rise to the allegations in the complaint. Not all will be called as witnesses, but the key witnesses are likely to come from their ranks.

26. These witnesses are scattered across the globe, but with significant concentrations in Europe. Of the 179 investigators, forty-four percent were located in the European Union. Only one was located in North Carolina. (Mem. in Supp. Ex. 4 Suppl. 5–9, ECF No. 20.5.) Of the roughly 100 CRAs, seventy-two were in Europe and two were in North Carolina. (Reply Br. Ex. 1 ¶ 6, ECF No. 81.2.) Twenty-two of the twenty-nine CPM team members were located in Europe while only two members were in North Carolina. (Reply Br. Ex. 1 ¶ 5.)

27. These witnesses and the work they performed were also managed from Europe. Three of the five Global Clinical Project Managers ("Global CPMs"), who were responsible for the overall operation of the study sites, were in Europe. (Reply Br. Ex. 3 ¶¶ 8–10.) None were located in North America. (Reply Br. Ex. 3 ¶ 10.) The

Global CPMs were supervised by two Line Managers, one located in England and the other in France. (Reply Br. Ex. 3 ¶ 9.)

28. Other teams that played relevant roles in the trial also appear to be concentrated in Europe. By way of example, a fifteen-member Executive Committee designed the trial protocol. (Mem. in Supp. Ex. 4 1957.) Eight of these team members were in Europe, none in North Carolina. (Mem. in Supp. Ex. 4 Suppl. 2.) When the investigators and CRAs ran into medical issues, including issues of protocol interpretation, the Medical Advisors provided guidance. (Mem. in Supp. Ex. 5 ¶ 9.) Two of the seven were in North Carolina, but four were in Europe. (Reply Br. Ex. 1 ¶ 7.) The investigators collected and processed patient data using a system developed by the Data Management team, every member of which was located in France. (Mem. in Supp. Ex. 5 ¶ 11; Reply Br. Ex. 1 ¶ 8.) The Biostatistician team was in charge of designing the trial's statistical analysis plan and had seven members located in Europe. (Mem. in Supp. Ex. 5 ¶ 12; Reply Br. Ex. 1 ¶ 9.) It seems clear that some of these individuals will be material witnesses; Cardiorentis has sought extensive information about their roles in the trial in its discovery requests. (Mem. in Supp. Ex. 8 ¶¶ 4, 5, 20(g), 44, ECF No. 20.9.)

29. Cardiorentis says little about these potential witnesses, instead emphasizing Defendants' quality assurance operations. Cardiorentis points to the Clinical Event Validation and Adjudication ("CEVA") system, a North Carolina-based team that Cardiorentis alleges trained the investigators and assisted with reporting protocol deviations. (Opp'n Ex. A ¶ 14(c)–(d), ECF No. 75.1.) But Defendants have

supplied evidence showing that the CPM team, CRAs, and investigators performed these duties, not CEVA. (Reply Br. Ex. 3 ¶¶ 7–12.) In addition, a separate Quality Assurance team conducted all of the trial's audits (thirty in Europe, two in North Carolina), and its members were located in Finland, Belgium, and Texas. (Reply Br. Ex. 2 ¶¶ 1, 3, 9–10, 12, ECF No. 81.3.)

30. CEVA appears to be an administrative data compilation tool that provided information to the Clinical Events Committee ("CEC") and Data Safety Monitoring Board ("DSMB"). These two teams played a role in ensuring patient safety. When a patient suffered a certain medical event, including death, the CEC analyzed the cause. (Reply Br. Ex. 4 ¶¶ 4–6, ECF No. 81.5.) The DSMB also evaluated patient safety data and was the body that ultimately recommended discontinuing the trial. (Reply Br. Ex. 4 ¶¶ 10–12.) The CEC team members are located entirely in Scotland, and three of the four DSMB team members were located in Europe. (Mem. in Supp. Ex. 4 Suppl. 3.)

31. Cardiorentis also alleges that ten other witnesses, all high-level IQVIA NC officers and employees, are located in North Carolina. (*See* Compl. ¶ 45(a)–(j); Opp'n 7, 12, 14.) According to Cardiorentis, these employees made or approved every medical and financial decision throughout the course of the trial. (Opp'n 7; Opp'n Ex. A ¶¶ 24, 25.) But the complaint does not clearly tie any of its allegations of wrongdoing to these IQVIA NC employees. In addition, IQVIA NC has supplied affidavits demonstrating that several of the witnesses had no day-to-day role in the trial. (*See* Mem. in Supp. Ex. 10 ¶¶ 10–13, ECF No. 20.11.)

32. The Court concludes, based on the complaint's allegations, that the more material witnesses are the trial personnel who were involved in drafting the protocol, training investigators, monitoring trial sites, identifying and reporting protocol deviations, and performing source data verification. As discussed above, most of these witnesses are located in Europe and few are located in North Carolina. It is therefore clear that England would be a far more convenient forum than North Carolina for the majority of the relevant witnesses.

33. Cardiorentis observes, correctly, that England and Europe are not synonymous and that most of these witnesses are not located in England. (Opp'n 9–10.) But the weight of authority holds that a European forum is more convenient when the preponderance of witnesses is concentrated in Europe. *See, e.g.*, *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978); *Vivendi S.A. v. T-Mobile USA, Inc.*, 2008 U.S. Dist. LEXIS 118529, at *34–35 (W.D. Wash. June 5, 2008); *Delta Brands, Inc. v. Danieli Corp.*, 2002 U.S. Dist. LEXIS 24532, at *25–26 (N.D. Tex. Dec. 19, 2002). Practically speaking, it is certainly easier for witnesses residing in Europe to travel to England than it is for the same witnesses to travel to North Carolina.

34. This is bolstered by the fact that many of the most material witnesses are third parties. The investigators, CEC team, and DSMB team members are not employees of IQVIA UK or IQVIA NC. (*See* Mem. in Supp. Ex. 4 Suppl. 5–9; Reply Br. 6; Reply Br. Ex. 4 ¶¶ 5, 10.) These witnesses are more likely to participate in the case if it proceeds in a European forum. *See Marnavi Splendor GmbH & Co. KG. v. Alstom Power Conversion, Inc.*, 706 F. Supp. 2d 749, 757 (S.D. Tex. 2010). And courts

often give greater weight to the convenience of nonparty witness. *See Morris v. Chem. Bank*, 1987 U.S. Dist. LEXIS 8031, at \*13–14 (S.D.N.Y. Sept. 10, 1987); *see also Banco de Seguros del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 262 (S.D.N.Y. 2007); *Mohamed v. Mazda Motor Corp.*, 90 F. Supp. 2d 757, 775 (E.D. Tex. 2000).

35. In short, the balance of witnesses with pertinent, firsthand information are in Europe, and England is a more convenient forum for those witnesses than North Carolina. The convenience of witnesses favors a stay.

2. Relative Ease of Access to Sources of Proof

36. Given the difficulty and expense associated with gathering evidence in a foreign jurisdiction, the relative ease of access to sources of proof has been considered particularly important in the *forum non conveniens* analysis. *See Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003). In analyzing this factor, a court should first consider the evidence required to prove or disprove each claim and then assess the likely location of that evidence. *See J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co., Ltd.*, 515 F. Supp. 2d 1258, 1270 (M.D. Fla. 2007).

37. Here, the Court has the benefit of reviewing Cardiorentis's discovery requests, which seek extensive discovery of evidence located largely in Europe. For example, Cardiorentis seeks information about the protocol, along with the identity of personnel involved with, and documents and communications related to, protocol deviations and the source data verification process. (Mem. in Supp. Ex. 8 ¶¶ 4–7, 13–15, 18, 25; Mem. in Supp. Ex. 9 ¶¶ 4, 5, 8–10, ECF No. 20.10.) Other discovery requests ask for information regarding the trial sites and associated staff, site visits,

and site management. (Mem. in Supp. Ex. 8 ¶¶ 8–12, 16–18, 44; Mem. in Supp. Ex. 9 ¶¶ 6, 7, 11.) And Cardiorentis seeks the meeting minutes of the CEC and the DSMB (whose members are primarily in Europe); information about a Blind Data Review Meeting (held in Scotland); and all documents related to inspections by Dutch and Swiss regulatory authorities. (Mem. in Supp. Ex. 5 ¶¶ 5, 14; Mem. in Supp. Ex. 8 ¶¶ 28, 29, 49.) The bulk of this information relates to European locations and personnel. (Reply Br. Ex. 3 ¶¶ 8–10.)

38. It will be much easier for the parties to access relevant sources of proof from England. Importantly, the Services Agreement that gives rise to all of IQVIA UK's trial responsibilities was executed in Reading, England. (Mem. in Supp. Ex. 1 ¶ 5, ECF No. 20.2; Services Agreement at 18.) England is also closer to much of the relevant evidence that will need to be collected from the study sites.

39. Conversely, North Carolina is not likely to be a significant source of evidence. Cardiorentis seeks, for example, discovery of all audits performed by Defendants. (Mem. in Supp. Ex. 8 ¶¶ 31, 32; Mem. in Supp. Ex. 9 ¶ 12.) Only two took place in North Carolina; the other thirty were in Europe. (Reply Br. Ex. 2 ¶¶ 9–10.) Documents related to CEVA may be based in North Carolina, but as discussed earlier, CEVA is likely to be less material than the Europe-centric teams it supported. (Reply Br. Ex. 4 ¶¶ 6, 8, 11.)

40. Additionally, if this case were to proceed in England, the parties may be able to take advantage of European Council Regulation No. 1206/2001. This regulation simplifies the exchange of evidence between members of the European Union. *See In*

*re Air Crash Over the Mid-Atl. on June 1, 2009*, 760 F. Supp. 2d 832, 844 n.8 (N.D. Cal. 2010); *Vivendi S.A.*, 2008 U.S. Dist. LEXIS 118529, at *37. To the extent it is available, this method of obtaining evidence slightly favors an English forum because it is preferable to obtaining evidence through the more "time-consuming and expensive" procedures of the Hague Convention. *Crosstown Songs U.K., Ltd. v. Spirit Music Grp., Inc.*, 513 F. Supp. 2d 13, 17 (S.D.N.Y. 2007); *see also Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, 2012 U.S. Dist. LEXIS 121438, at *22 (E.D.N.Y. Aug. 27, 2012).[3]

41. Given the worldwide nature of the clinical trial, Cardiorentis and Defendants will be required to undergo extensive and burdensome evidence production from abroad whether the case proceeds in North Carolina or England. But there is little relevant evidence in North Carolina, and England is much closer to important sources of proof. This factor favors a stay.

3. Availability of Compulsory Process

42. Both North Carolina and England allow courts to compel unwilling witnesses to attend trial proceedings. Federal courts have generally found that this factor favors dismissal from an American forum when, as here, a large number of witnesses are located overseas beyond the reach of a court's compulsory process. *See*

---

[3] Cardiorentis argues that the United Kingdom's anticipated exit from the European Union casts doubt on the availability of European Council Regulations, but this argument is speculative. (Opp'n 15–16.) The timing and details of the so-called Brexit remain unsettled, and there is uncertainty as to whether the relevant procedural mechanisms (and many other EU regulations) would or would not continue to apply.

*MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 2010 U.S. Dist. LEXIS 70191, at *20 (W.D. Va. July 13, 2010).

43. However, where the moving party fails to allege that nonparty witnesses would participate only if compelled to do so, the availability of compulsory process "should be given little weight in the overall balancing scheme" of the *forum non conveniens* analysis. *DiFederico*, 714 F.3d at 806; *see also Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1231 (9th Cir. 2011); *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006); *Peregrine Myan. Ltd. v. Segal*, 89 F.3d 41, 47 (2d Cir. 1996). Neither side has identified any involuntary witnesses here. In the absence of meaningful evidence of the need for compulsory process, the factor is neutral.

## C. Applicable Law

44. State and federal courts alike agree that the need to apply foreign law favors a stay in a *forum non conveniens* analysis. *See, e.g.*, *Manuel v. Gembala*, 2012 N.C. App. LEXIS 359, at *12 (N.C. Ct. App. Mar. 20, 2012) (upholding stay on appeal because, "most notably," the claims were governed by federal law and other States' laws); *see also Piper Aircraft*, 454 U.S. at 260 n.29 (citing cases); *NLA Diagnostics LLC v. Theta Techs. Ltd.*, 2012 U.S. Dist. LEXIS 108779, at *12–13 (W.D.N.C. Aug. 3, 2012).

45. Cardiorentis's claims for breach of contract will be governed by English law. The Services Agreement specifies that it must be construed and applied "in accordance with the laws of England and Wales," (Services Agreement § 28.0), and North Carolina courts generally honor choice-of-law clauses. *See IPayment, Inc. v.*

*Grainger*, 2017 N.C. App LEXIS 1087, at *9, 808 S.E.2d 796, 800 (2017). The Quality Agreement does not have its own choice-of-law provision but, as an outgrowth of the Services Agreement, will also be governed by the law of England and Wales. (Quality Agreement § 1.) Cardiorentis does not dispute that either agreement is governed by English law.

46. While American courts can and do apply foreign law, they regularly hold that English courts are better equipped to apply English law. *See, e.g.*, *Rabbi Jacob Joseph Sch.*, 2012 U.S. Dist. LEXIS 121438, at *13–14; *Denmark v. Tzimas*, 871 F. Supp. 261, 271 (E.D. La. 1994). Moreover, applying and proving foreign law can impose significant costs on parties in terms of time and money and can also increase the administrative burden on the court. *See Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1181 (10th Cir. 2009); *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1339 (S.D. Fla. 2010); *Stroitelstvo Bulg., Ltd. v. Bulgarian-Am. Enter. Fund*, 598 F. Supp. 2d 875, 889 (N.D. Ill. 2009). Therefore, that the contract claims are governed by English law favors a stay.

47. As to Cardiorentis's remaining claims, the parties vigorously dispute the applicable law. Generally, lex loci delicti "is the appropriate choice of law test to apply to tort claims," including fraud. *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722 (2010). The appropriate test for claims asserted under the Unfair and Deceptive Trade Practices Act is unsettled, however. *Compare Harco Nat'l*, 206 N.C. App. at 698, 698 S.E.2d at 726 (applying lex loci), *with Andrew*

*Jackson Sales v. Bi-Lo Stores, Inc.*, 68 N.C. App. 222, 225, 314 S.E.2d 797, 799 (1984) (applying "most substantial relationship" test).

48.     To evaluate this factor, the Court need not definitively determine which law governs, particularly when leaving the question open would avoid "unnecessarily addressing an undecided issue of [state] law." *Galustian v. Peter*, 561 F. Supp. 2d 559, 565 (E.D. Va. 2008). It suffices to note that North Carolina law is unlikely to apply to any of the tort claims.

49.     Under the lex loci test, tort claims are governed by the law of the place of injury, which is sustained in the jurisdiction where the last act giving rise to the injury occurred. *See Harco Nat'l*, 206 N.C. App. at 694, 698 S.E.2d at 724; *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 14, 598 S.E.2d 570, 580 (2004). The last act is often "the suffering of damages." *M-Tek Kiosk, Inc. v. Clayton*, 2016 U.S. Dist. LEXIS 67036, at *49 (M.D.N.C. May 23, 2016) (alterations and quotation marks omitted). There is no bright-line rule that a corporate plaintiff suffers injury in the forum where it maintains its principal place of business. *See Harco Nat'l*, 206 N.C. App. at 697, 698 S.E.2d at 725–26. But in this case, Cardiorentis asserts injury in the form of costs it paid to mount the trial, other costs and expenses associated with the trial, and lost profits. (Compl. ¶¶ 83–84.) Cardiorentis likely suffered these losses at its corporate home in Switzerland. (Compl. ¶ 11.) Therefore, it appears that Swiss law would govern all of Cardiorentis's tort claims if the Court applied lex loci.

50.     If the Court were required to apply the most significant relationship test to the unfair trade practices claim, the question would be which forum has the strongest

ties to the case. *See, e.g., Andrew Jackson*, 68 N.C. App. at 225, 314 S.E.2d at 799. Cardiorentis's claim is primarily fraud-based, essentially alleging that Defendants improperly concealed their breaches of a contract between English and Swiss companies and governed by English law. (*See, e.g.*, Compl. ¶¶ 104(b)–(c), 104(e).) Under this test, it seems likely that English or Swiss law would govern, not North Carolina law.

51. At this stage, it is evident there will be substantial questions of English law. It also appears likely that a court will need to apply Swiss law to at least some of Cardiorentis's claims and unlikely that North Carolina law will govern any of the claims. Therefore, this factor favors a stay.

## D. Local Concern and Nature of the Case

52. The Court must also consider the nature of the case and whether either forum has a local interest in resolving the controversy. At its root, this case concerns the performance of a global clinical trial pursuant to a contract (the Services Agreement) that is between English and Swiss companies and governed by English law. England therefore has a clear, strong interest. *See NLA Diagnostics*, 2012 U.S. Dist. LEXIS 108779, at *12–13.

53. By contrast, North Carolina has a weaker interest. Most of the conduct giving rise to the claims occurred in Europe, not North Carolina. The sole tie to North Carolina is the fact that IQVIA NC is located in this State. (Compl. ¶ 12.) Although our courts have a general interest in providing a forum to hear disputes involving injuries caused by citizens of the State, *see Reid-Walen*, 933 F.2d at 1400, this interest

is diminished when the lion's share of relevant activity occurred abroad and when the controversy is unlikely to be governed by North Carolina law.

54. Thus, the Court concludes that England possesses the stronger interest in resolving this dispute. *See, e.g.*, *Gullone v. Bayer Corp.*, 484 F.3d 951, 959 (7th Cir. 2007); *Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003). These factors favor a stay. *See La Mack*, 2015 NCBC LEXIS 24, at *21.

### E. Fair and Reasonable Forum

55. As a prerequisite to the entry of a stay, the moving party "must stipulate his consent to suit in another jurisdiction." N.C. Gen. Stat. § 1-75.12(a). This condition is met here. IQVIA UK and IQVIA NC have stipulated their consent to suit in either England or Switzerland. (Mem. in Supp. 23.)

56. Section 1-75.12(a) also requires that the alternative forum be reasonable and fair. This, too, is satisfied. Cardiorentis does not contend that England is an unreasonable or unfair forum. (Opp'n 3.) Indeed, England is "a forum that American courts repeatedly have recognized to be fair and impartial." *Haynsworth v. Corp.*, 121 F.3d 956, 967 (5th Cir. 1997); *see also Tarasewicz v. Royal Caribbean Cruises, Ltd.*, 2015 U.S. Dist. LEXIS 84779, at *39–40 (S.D. Fla. June 30, 2015); *Capital Mkts. Int'l v. Gelderman, Inc.*, 1998 U.S. Dist. LEXIS 12488, at *12 (N.D. Ill. Aug. 7 1998).

### III.
### CONCLUSION

57. After considering the relevant factors, the Court finds in its sound discretion that this case should be stayed pursuant to section 1-75.12(a). The convenience of witnesses, ease of access to sources of proof, applicable law, and local interest factors

significantly favor a stay and outweigh any deference due to Cardiorentis's choice of forum. The balance of all relevant factors shows that it would be more convenient for the parties to litigate these claims in England. Defendants have shown that a substantial injustice would result if this case were to proceed in North Carolina and that England is a convenient, reasonable, and fair place of trial. For these reasons, the Court **GRANTS** Defendants' motion to stay, and this action is **STAYED** until further order of this Court.

58. As a result, the Court need not and does not decide whether it may exercise personal jurisdiction over IQVIA UK or whether Cardiorentis has failed to state its claims for relief. The Court **DENIES** as moot Defendants' motion to dismiss for failure to state a claim and IQVIA UK's motion to dismiss for lack of personal jurisdiction. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007) (holding that *forum non conveniens* is a threshold issue that may be decided before ruling on personal jurisdiction or other issues).

59. During the pendency of the stay, the Court will hold this case on an inactive docket. The Court **ORDERS** that the parties shall jointly file a status report within six months of the entry of this Order and every six months thereafter. In the event the parties resolve this dispute by settlement or other means, they shall notify the Court within seven days of reaching any resolution.

**SO ORDERED**, this the 31st day of December, 2018.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases